[Civil No. 3990. Filed May 1, 1939.]

[89 Pac. (2d) 1060.]

E. C. ADAMS et al., Appellants, v. SALT RIVER VALLEY WATER USERS' ASSOCIATION, Appellee.

376

Messrs. Woolf & Shute, for Appellants.

Messrs. Sloan, Scott & Green and Mr. Matt S. Walton, for Appellee.

ROSS, C. J.—The plaintiffs are owners of farming lands in the Tempe area of the Salt River Irrigation Reclamation Project and shareholders of the defendant, Salt River Valley Water Users' Association, a corporation. In this opinion we shall refer to the parties as they were in the trial court, that is, as Tempe landowners or plaintiffs, and the Association or defendant.

The Association was incorporated at the instance of the Secretary of the Interior so that he would have a single agency to deal with in the installation of the Salt River Project instead of all of the landowners thereunder. The Association's board of governors and council are landowners with water rights, and are chosen from time to time by the whole membership at popular elections and from different sections of the Project.

The Association performs several functions for its members. It has charge of the Project's irrigation system and therefore attends to the carrying and delivering to those of its members entitled thereto their proportion of irrigation water, at times, places and in

the manner provided for by its charter and regulations. Another important function of the Association, delegated to it by its members and exercised in conjunction with the federal government, has been the building of three reservoirs on the Salt River to supplement the Roosevelt reservoir, and one on the Verde River. Its members have also constituted the Association their agent to sink wells in their lands and equip them with pumps to lift the underground water for use in the irrigation of their lands in dry seasons or when there is a shortage of water in the reservoirs and river flow. Originally there was no problem of drainage in the Project. The "Salt" River was so named because of the salinity of its water. Large areas of the Project lands in time became waterlogged and impregnated with so much salt that they were infertile. The members of the Association voted bonds against their lands to install pumps to dewater their lands, and constituted the Association their agent to do the work.

Incidental to the works erected by the Association and the Government to impound and conserve water for use in irrigation, hydroelectric power was developed for use in pumping underground water for irrigation purposes, and also to dewater waterlogged lands in the Project. The sale of such power to public utilities, mining companies and others has been a source of considerable income to the Association.

Plaintiffs' grievances are not that defendant has been derelict in its duties of catching and conserving the waters that fall into the watershed of the Salt and Verde Rivers, and in developing the underground waters in the valley, but that it has failed and refused to deliver to plaintiffs their appropriated water, as determined under the Kent Decree, and their proportionate share of stored and developed water; and, in the performance of its duty of draining plaintiffs' lands, it is charged defendant has lowered the water

table too deep for the proper protection and productivity of plaintiffs' lands and because thereof greater quantities of water will be needed for the proper irrigation of their lands.

The relief asked is that the Association be required (1) to deliver to plaintiffs (except those in classes B and C) their appropriation of the flow of the Salt River; (2) to deliver to plaintiffs their proportionate part of stored and developed water; (3) to cease and desist from delivering to plaintiffs for irrigation pump water in lieu of their appropriated or stored water, and delivering their appropriated water and stored and developed water when needed by them to others, either in or out of the Project; and (4) to cease and desist from pumping any water from plaintiffs' lands not reasonably and necessarily required properly to drain them.

The Association's answer is that the services it had rendered plaintiffs, in furnishing them irrigation water and in draining their lands, are the same services it had rendered its members before plaintiffs joined the Association, which the plaintiffs well knew, and that plaintiffs had after joining the Association acquiesced in such services for the ten years last past, and for these reasons should not be permitted to complain of said services at this time. That such services so rendered plaintiffs were equal to like services rendered its members before plaintiffs joined the Association and since. The Association insists that the services rendered plaintiffs are not different from those rendered other landowners of the Project with similar rights and priorities, except unavoidable discrepancies from natural causes, such as soil diversity, land configuration and location.

There is not much controversy or dispute as to the facts. It appears that the water supply, consisting of the normal flow of the Salt River and that stored be-

hind the various dams and that developed by pumping, has been, when commingled, sufficient to irrigate the lands of the shareholders of the Project since 1924. The plaintiffs recognize the Association's right and duty to commingle these three sources of supply, as witness the plaintiffs' first and second prayers for relief. Plaintiffs, however, contend the Association has been delivering their appropriation of the river flow and their proportionate share of the storage water to other shareholders, and delivering to plaintiffs in lieu thereof water developed by pumping, and that such pump water is not as desirable for irrigation as the river flow and stored water for the reason it contains more salt.

Whether under the Association's charter and the Tempe Contract, under which plaintiffs became shareholders of the Association, the latter had the right to commingle the waters from the three sources of supply, is one of the questions to be answered. The other question is whether the Association, in the process of dewatering plaintiffs' waterlogged lands, should be enjoined from lowering the underground table more than eight or ten feet from the surface, or lower than necessary properly to dewater such lands.

After a trial extending over a considerable period of time, the court, at the request of plaintiffs, made findings of fact and conclusions of law separately and upon them decided the case in favor of the defendant. From such decision and judgment, plaintiffs have appealed.

It will be necessary before we enter upon a discussion of the assignments to state some additional facts that appear in the record, and some things of common knowledge that may not be questioned by either party and are basic to the rights of both.

Reference has been made to the Kent Decree. This decree was rendered by the Honorable EDWARD

KENT in the case of *Hurley* v. *Abbott et al.,* the United States intervener, in the District Court of the Third Judicial District of the Territory of Arizona in and for Maricopa county, on March 1, 1910. The action was brought to ascertain who in the Project were entitled to water rights in the flow of the river and to establish their priorities. Everybody, from the first locators of water rights in 1869 through the succeeding years up to 1908, receiving river water from canals heading at or above "Joint Head" (about six miles east of Phoenix), was made a party and his rights to the river flow were determined as to quantity and priority. The court found that the acreage of such lands was approximately 151,000, of which about 16,000 acres were in the Tempe area now occupied by plaintiffs; that there were 28,000 acres to which water rights might be extended if the owners complied with the Association's charter. The 151,000 acres were classified as "A" lands, which were decreed to be "entitled, according to their relative dates of reclamation and by years, to the use of the normal flow of the water in the river to the extent necessary for their economical cultivation." The lands not in the "A" class were designated as "B" and "C" lands. Neither of these classes was given any right to the use of the normal flow of the river, that flow having been appropriated by the "A" lands. Judge KENT gives the reasons for classifying the lands of the Project and in his judgment and decree states:

"By agreement entered into between the United States and the Water Users' Association, the members of the latter, whether owners of land in classes A, B or C, are to be entitled to the benefits of the stored water in the Roosevelt reservoir, in such extent of acreage as the project shall serve. These benefits are to be formally obtained by those entitled thereto after the completion of the dam and upon the formal opening thereafter by the Government of this reclamation proj-

ect, by contractual obligations then to be entered into by the members of the Water Users' Association with the Government. The stored water is to be distributed to those who shall have the right thereto, proportionally according to the acreage of the land, and irrespective of any priority of irrigation or cultivation of such land. . . .

" . . . When the flow in the river is less than the maximum amount, the amount available shall be distributed to the various canals for those parcels of land first entitled thereto according to their relative dates of priority by years as shown in the table. All flood and stored waters shall be shared by those entitled to it, and who can avail of it, irrespective of dates of priority."

This decision provides a method of computing the amount of the river water to which appropriators were entitled and states "and no water user entitled thereto shall be deprived against his consent of his proportionate share of the normal flow of the river by reason of such impounding dam" (Roosevelt dam). Under this decree, "A," "B" and "C" lands are placed upon an equal footing so far as stored water is concerned. This decree and the charter of the Association, which seem to harmonize with each other and were doubtless intended to, have been the Association's guide and source of authority in the distribution of irrigation water from the various sources of the Project. Sections 5, 6 and 7, of article V of said charter, read:

"Section 5. The ownership of each share of stock of this Association shall carry, as incident thereto, a right to have delivered to the owner thereof water, by the Association, for the irrigation of the lands to which such share is appurtenant.

"Section 6. The amount of water so to be delivered to such owner shall be that proportionate part of all stored and developed water, the storage or development of which is or may be effected by this Associa-

tion, or by means of works under its control, management or direction, or which may become available for distribution by this Association from irrigation works built by the National Government during any irrigating season, as the number of shares owned by him shall bear to the whole number of valid and subsisting shares of the Association issued and then outstanding, to be delivered to and upon said lands at such times during such season as he may direct.

"Section 7. And there shall also be incident to such ownership of such shares the right to have delivered to the owner thereof, for the irrigation of said lands, as the Association shall from time to time acquire means for that purpose, the water heretofore and before the shareholder or his transferee became a member of this Association, appropriated by him or by his predecessors in interest, for the irrigation of said lands: Provided, however, that the whole amount of water actually delivered from all sources shall not exceed the amount necessary for the proper cultivation of said lands."

It is seen that section 5 makes ownership of shares of stock a condition to the right to have irrigation water served such owner by the Association. Section 6 provides that the amount of stored and developed water the owner is entitled to have delivered to his lands is the proportion his shares bear to the whole number of outstanding shares. Section 7 clearly applies to "A" lands only. It provides that "A" lands shall have a right to have delivered their river water but that the amount actually delivered from "all sources" shall not exceed the amount necessary for proper cultivation of the lands.

■ One of the objects for which the Association was organized, according to section 1, article IV, is:

"To provide for and distribute and furnish to the lands of the holders of shares of said Association to which said shares and the rights and interests represented thereby are appurtenant, an adequate supply of water for the irrigation of said lands; . . . "

The Association performs this function not as the owner of the irrigation water, because it cannot and does not *own* the water. It is a carrier of the water for its shareholders, who have delegated to it, subject of course to review by the courts, the power to determine in the first instance the source or sources from which each shareholder is entitled to have his irrigation water. It is this power the plaintiffs claim has been wrongfully exercised to their injury.

The question raised is not free from doubt nor easily decided. It is of momentous interest to the whole Project, as well as to a large population residing in and dependent upon the Project. For that reason, we think it should be approached and decided on broad lines and, if possible, in accordance with the general policy that has been followed by the Association, which has been, as we gather, an honest and conscientious effort to preserve to each landowner his rights as stipulated in the Kent Decree and the Association's charter, except when deviations have been consented to or made necessary by some compelling or unavoidable cause or circumstance.

It should not be overlooked that each member of the Association, regardless of where his land is located in the Project, or its class, or character, is required to contribute an equal amount per acre for the cost of the Project and its upkeep. Originally this was all right, for it evidently was based upon an understanding or belief by the Association that each and every member, at least during normal seasons, could be supplied with irrigation water for his lands—the "A" lands from the river flow supplemented by flood and storage water, and "B" and "C" lands from flood and storage water. It was the long dry seasons that soon demonstrated that the Association had accepted subscribers for too many acres for the river and storage

water supply. However, any of its members deprived of water by reason of excessive acreage or drouth conditions could not complain, for they became members knowing that such a thing might happen, and that first in time was first in right when there was a shortage, whatever the cause. This aspect of the situation, however, was entirely changed when the problem of drainage presented itself to the Association and its shareholders. Drainage was not necessary in all parts of the Project. In some parts, however, it was acute and imperative if the lands were to be farmed and crops grown. In places the water had risen to the surface and stood in pools. Generally the waterlogged lands were "A" lands, and generally the "B" and "C" lands were not waterlogged. These latter, as also "A" lands that were not waterlogged, have been assessed at the same rate as the waterlogged lands for a drainage system. Natural justice, it would seem, would require the waterlogged lands to concede something to the higher lands that do not become waterlogged and cannot, because of their being higher, have delivered to them the pump water; and, as we shall see later, such concession has been the delivery of less river and storage water to such waterlogged lands and more pump water from such lands or nearby lands.

The owners of "A" lands on the north side of the river (91,813 acres) and most of the owners of such lands on the south side of the river (45,000 acres) joined the Association before the Kent Decree, as did also the "B" and "C" lands in those areas. The plaintiffs and their predecessors in interest, including those of "B" and "C" lands, refused or declined to join and continued, through their own irrigation system, to operate as an independent unit until February 9, 1924. They maintained their own diversion

dams, all of which were below Granite Reef diversion dam, until the Association, to save and economize water, arranged to deliver to the plaintiffs from the Granite Reef dam their proportion of the river and flood water flow. Otherwise the Association had nothing to do with plaintiffs and was under no duty to them. It was up to plaintiffs to provide their irrigation system and also to dewater their waterlogged lands, and in order to get hydroelectric power for pumping to irrigate and to dewater their lands they had to buy it, like any other customer, from the Association.

Some fifteen years after the Project had been operating, or in 1923, plaintiffs entered into negotiations with the defendant with a view of joining the Association. At that time the plant and facilities of the Association had been greatly expanded and improved. The Project had proved itself a success, the greatest of its kind in the country. Its acreage had increased to 242,-000 of which 91,000 acres were in classes "B" and "C" and 151,000 in class "A." Plaintiffs, of course, were familiar with the situation before they became members of the Association on February 9, 1924, as per the contract between plaintiffs and the Association dated June 16, 1923, which will be referred to hereafter as the Tempe Contract. By the terms of this contract the plaintiffs assumed and agreed to pay to the Association their proportion of the cost of the Project, and the Association agreed to accept a transfer of the Tempe system of irrigation and drainage as a part of the irrigation and drainage works of the Project, and to pay plaintiffs therefor. The "General Purposes" of the Tempe Contract were stated to be:

"The object and purpose of this agreement is to provide and execute a general plan for the unified operation of the irrigation and drainage works situated within the Reservoir District substantially all of which

are controlled by the parties hereto or their associates, and thereby conserve irrigation water, reduce expenses of operation, remove danger of friction and litigation, provide funds for the construction of better drainage and irrigation facilities, and give better service of irrigation water to the land owners at reduced cost."

The Association agreed with plaintiffs that their lands would be

"thereafter furnished in perpetuity with irrigation and drainage service, including ditches for surface water, *equal to the like service,* then or thereafter provided and furnished to the Project Lands; . . . " (Italics ours) and that such lands would "be entitled to and receive all the rights, privileges and benefits and be subject only to the same liabilities and obligations as the Project Lands; . . . "

In another place in the contract the Association agrees that it will

"make all such changes, enlargements, extensions and improvements of said properties, and construct and install all such new and additional works and appliances as may be necessary or proper to provide and furnish all of the District Lands (plaintiffs') with irrigation and drainage service, including ditches for surface water, *equal to the like service then provided and furnished to Project Lands, and will thereafter, in perpetuity provide and furnish all of said District Lands with irrigation and drainage service, including ditches for surface water, equal at all times to the like service furnished said Project Lands. . . . "* (Italics ours.)

The court found as a fact "that the Association has carried out and performed its part of said contract." Plaintiffs assign this finding as erroneous

"because, as appears by the undisputed evidence and as substantially admitted in the answer, appellee has not only failed to perform but has deliberately breached its covenants in the Tempe Contract, in that

it has, in violation of appellants' rights, not delivered for the irrigation of appellants' 'A' lands the normal flow, flood and stored waters that belong to those lands, but, on the contrary, has diverted and delivered large quantities of said waters to other 'A' lands having later dates of appropriation of normal flow water, and to 'B' and 'C' lands, and in lieu of said river waters it has delivered to and forced upon appellants for the irrigation of their lands excessive quantities of pump water.''

This assignment raises the question as to whether plaintiffs are entitled to have delivered to them the ''normal flow, flood and stored waters that belong to'' their ''A'' lands, or whether water equally suitable for irrigation from any other available source or sources is all they are entitled to. We think the priorities established by the Kent Decree should be observed so long as and where it is possible. Those rights were vested and are jealously guarded and protected, not only in the Association's charter but in the Tempe Contract. The charter, article XIV, provides:

''Nothing in these Articles of Incorporation, or in the fact of becoming a member of this Association, shall be construed as affecting, or intended to affect, or in any way interfere with the present vested rights of any person to the prior use, or delivery, of the natural appropriated flow of the waters of the Salt and Verde rivers.''

One of the provisions of the Tempe Contract undertakes to protect such vested right as follows:

'' . . . that nothing contained in this agreement or in any such transfer (by plaintiffs) . . . shall be deemed or held to be an assignment, transfer, conveyance or surrender of any vested right to the use of water for irrigation; . . . ''

We agree with plaintiffs that in water-right law in the arid west ''first in time is first in right.'' We also agree that such right, when perfected, is a vested right

and may not be taken from its owner except by his consent. Such vested right is not in the water but in its use. Waters of the state subject to appropriation for irrigation are public property, and the policy of the state is to limit the right of appropriation to their use. The right the law gives to an appropriator to the use of water for irrigation is not necessarily in the water flowing in a given stream, or at a particular point of diversion in such stream. The source of his supply may be changed without his consent, providing the quality of the water is not lowered and he is put to no expense, and of course such change can be made when he consents. In the Kent Decree water rights in the flow of the Salt River were adjudicated. No other waters were involved. This appears in the language of the decree as follows:

"It is ordered, adjudged and decreed; that the various parties hereto, and their successors in interest be, and they hereby are, entitled to divert or to have diverted from the water flowing in the Salt River to and upon the land owned or possessed by them as their interest may appear, for beneficial use upon such land, such amount of water as may be necessary and proper for the economical and successful irrigation and cultivation of such land, in area and extent, and in duration, and according to the relative rights in priority of appropriation . . . "

When this decree was entered there was no stored water, but there was expected to be and, accordingly, the decree provided that members of the Association, whether in class A, B or C, should have the same right to such water. While the decree confirmed the right of the owners of "A" lands to the use of the normal flow in the river, it would hardly be contended that such owners would have a right to complain if the Association delivered to them water of equal quality, whether it be flood water that the Association by its dams and reservoirs prevented from rushing by the

thirsty lands of the Project on to the sea, to be released when needed, or water from any other source. As a matter of fact, after the waters of the Salt River are impounded behind the Roosevelt and other dams, they are an admixture of the normal flow and flood waters that are intercepted by dams. There has been, it is true, daily released to the appropriators of the normal flow by the Association an amount of such admixture equal to the estimated daily normal flow. The Kent Decree, when interpreted in the light of the facts, quieted the title of owners of "A" lands in and to water of the same character and quality as the normal flow of the river, but it was different water. This difference, however, was unimportant but highly to be approved as it assured more water for more land and therefore a greater prosperity for the Project.

■ When the Tempe Contract was entered into the Association had three sources of water supply, to wit: the river flow, stored water and pump water, all of which were recognized as suitable for irrigation and were actually being used in some sections of the Project, and especially in the Tempe area, for that purpose. The Tempe Contract does not so stipulate, nor do we think it necessary that it should, that the plaintiffs' irrigation water could be made up of a mixture of the three sources then available, or of any one or two of such sources, since the right to deliver such water to the Tempe lands is not dependent upon a contract but upon the suitability and efficiency of such water for irrigation.

The landowner may not insist that his water supply be delivered from the same source or at the original point of diversion, and that, we think, is especially true where he is a member of a mutual association operating under a unified plan, as here. The Tempe Contract protects the landowner with a vested right under the Kent Decree "to the use of water for irri-

gation." The source of supply is immaterial, provided it is irrigation water, that is, water recognized as suitable and fit for irrigation of the Project lands.

It appears that pump water was used in the Project lands prior to March, 1910, for Judge KENT says in his decision in the Hurley-Abbott case:

"Evidence has been given of the existence of a number of pumping plants by means of which the supply of water from the river to which the land is entitled in times of scarcity is supplemented by an underground supply thus made available. In other instances water so pumped is the only means of supply."

It is undisputed that pump water, to some extent, was being used for irrigation in the Project prior to plaintiffs joining it, and the evidence is that plaintiffs, before joining, used such water for irrigation in the years and amounts as follows:

| | Acre-feet |
|---------|-----------|
| 1913–14 | 33,000 |
| 1914–15 | 12,000 |
| 1915–16 | 14,000 |
| 1916–17 | 15,000 |
| 1917–18 | 27,000 |
| 1918–19 | 31,000 |
| 1919–20 | 41,000 |
| 1920–21 | 31,000 |
| 1921–22 | 31,000 |
| 1922–23 | 43,000 |
| 1923–24 | 55,000. |

The acre-feet here shown should be charged against the whole acreage on the south side, and not against plaintiff's acreage alone.

We take judicial notice that some of the projects in the valley, other than the Salt River Project, use only pump water for irrigation and produce good crops. Indeed, one of the issues of this case was

whether the river flow when low, as in very dry seasons, was more salty than pump water and therefore not so good for irrigation. The court made no finding on the issue but doubtless would have done so had the evidence been decidedly preponderant one way or the other.

█ The action and conduct of the parties to the Tempe Contract demonstrate beyond a peradventure that it was intended that the distinction as to the source of irrigation water was no longer to be followed, and that only priorities as established in the Kent Decree would be inviolate. In other words, that "A" "B" and "C" lands would be furnished, without discrimination, irrigation water from the three sources of supply as long as such supply was available, fit, suitable and efficient, but that when such supply was sufficient only for "A" lands it would be distributed to such lands according to their priorities. This leaves undisturbed the vested right of "A" lands to the use of river water, or its equivalent, for irrigation.

Beginning in 1924, many wells were sunk and pumps installed, in addition to those already in operation, for the purpose of procuring pump water for irrigation. It appears that the amount of pump water used in the Project after plaintiffs had joined is, by years, as follows:

| | Acre-feet |
| ------- | --------- |
| 1924–25 | 211,866 |
| 1925–26 | 219,507 |
| 1926–27 | 192,296 |
| 1927–28 | 215,744 |
| 1928–29 | 232,999 |
| 1929–30 | 311,695 |
| 1930–31 | 313,072 |
| 1931–32 | 39,341 |

| | Acre-feet |
|---------|-----------|
| 1932–33 | 215,333 |
| 1933–34 | 267,361 |
| 1934–35 | 212,383. |

After the execution of the Tempe Contract and for ten years, or until 1935, the Association commingled the pump water with the river flow and the stored water and delivered the mixture to the members of the Project, including plaintiffs, under a uniform practice, and all of the landowners in the Project accepted such delivery. In that connection the trial court found:

"That in 1925 a severe water shortage developed, and a large number of additional wells were installed thereafter, with the approval of the vote of the shareholders, to provide an additional supply of water for the lands of the shareholders for irrigation purposes. That a part of said wells were located so as to not only provide water for irrigation, but also to provide drainage for the lands of the shareholders. That all of the water developed from wells, during and after the year 1925, wherever possible has been used to supplement the water supply of the members of the Association. That a large part of the money used to install said wells during and after the year 1925 was authorized by a vote of the shareholders, and was carried by a vote of four to one in the Association as a whole, and by a vote of approximately ten to one in favor of the proposition by the shareholders in the Tempe District. That since 1925, the definite policy of the Association has been to pump water to supplement the gravity supply for irrigation, and to provide drainage for the lands of the shareholders, and to use such water for irrigation purposes.

" . . . That a serious water shortage would have occurred during many years in the past unless the gravity supply of water for the members of the Association had been supplemented by pumped water. That in the eleven year period between 1924 and 1935, there would have been at least five years during which there would have existed an insufficient water supply

for the irrigation of the lands of the Project, and the reservoirs of the Association would have been, during a part of all of said years, entirely dry, unless the gravity supply had been supplemented with pumped water.''

Mr. C. C. Cragin, who was the general superintendent and chief engineer of the Project for some twelve or thirteen years, testified, in substance, that in his opinion the flow of the river was not sufficiently constant at all times to supply the Project the necessary irrigation water, and if it had not been for the pump water ''from the year 1924 to the present time (1936), this Project would have met with disaster'' and ''such a calamity couldn't help but injure every person in the valley.'' He also testified that it was the opinion of the board of governors and the executive officers of the Association that the Roosevelt reservoir would have been dry the first day of July (1924), and for three or four successive years, if it had not been for the pump water from the Tempe area, and that not over 60,000 acres of the Project could have finished their crops. Cragin's successor, Mr. H. J. Lawson, testified:

''The pump supply or the ability to pump water from under this Project in emergencies is the only thing that has saved this Project from absolute disaster for many years in the last ten or twelve, and the purpose of having these pumps is to have an emergency supply. They are an insurance of our water supply. In this southwest country there is not enough water in the region, that comes down the river, to supply the lands that are irrigated in this area. Other years there is plenty, but many years there is not enough and the pumps are the things that provide the insurance of the water supply and prevent disaster when water is short, which is frequently.''

It is a well-known fact that the emergency requiring the use of pump water for irrigation has continued up

to the present time (May, 1939). Apparently most of the shareholders of the Association have realized the necessity of commingling the pump water with the river and stored water and have acquiesced therein.

Beginning along about 1924 the Association, acting under instructions and direction of its members, progressively increased its facilities to pump water from its members' lands, both for irrigation and drainage. Before that time, it had sold or disposed of most of the pump water to projects outside of the Salt River Project. In 1935 the Association's charter was amended (sec. 3, art. 4, and sec. 8, art. 8) so as to prohibit the Association from disposing of such pump water to any person or land "outside the exclusion line of the Salt River Project" without the affirmative vote of three-fourths of its members. No other deduction can be drawn from this course of action than that it was the intention of the members of the Association to retain such water for irrigation of the Project lands. Indeed, that was the only alternative to selling or otherwise disposing of it to outsiders.

In the foregoing discussion of the plaintiffs' first assignment of error, we have disposed of their principal, if not their only challenging, ground for the relief asked, to wit, that the service by the Association of the three kinds of water commingled to plaintiffs' "A" lands, instead of the decreed river flow, took from plaintiffs a property right without their consent, in violation of the Fourteenth Amendment, also section 17, article 2 of the state Constitution. Of course if plaintiffs were able to sustain such a proposition, the Association's duty to deliver to them river flow would follow, regardless of the calamitous or disastrous results to the Project as a whole or to the community dependent on the Project. Fortunately, however, the facts on that contention

are against plaintiffs. In the first place, plaintiffs' prayer for relief is that the Association be required to deliver to them their appropriated river flow and their proportionate share of stored and developed water. It will be noticed the prayer is not for separate deliveries of these sources of water supply. In the second place, the Tempe Contract does not preserve to plaintiffs any particular water, such as the river flow, but does preserve inviolate a "vested right to the use of water for irrigation," meaning thereby the use of water equivalent to the river flow. In the third place, the parties to the Tempe Contract, in their dealings during the last ten years before the institution of this suit, had construed the contract as authorizing the commingling of the three sources of water for use for irrigation in emergencies to prevent ruin and disaster to large areas occupied and cultivated but which the owners might be compelled to abandon unless the pump water was commingled with the other two sources. In the fourth place, under the Tempe Contract, the service the Association bound itself to give to plaintiffs was to be "equal to the like service" then or thereafter furnished other Project lands. The services apparently were uniform throughout the Project after plaintiffs joined the Association and the result was the same except where natural causes, such as soil, configuration or location effected a different result. For example, we cite the following findings of fact:

"That plaintiffs' lands have received a higher percentage of the pumped water than the average delivered to all of the project lands. A small percent of lands in the Project has received a higher percent of the pumped water than the plaintiffs' lands.

"That the water delivered to the plaintiffs' lands contains on an average a higher salt content than the average water delivered to the project as a whole.

However, the water delivered to some of the project lands contains a higher salt content than that delivered to plaintiffs' lands; and a small percentage of the project lands receive only river water on account of their locations.

"That the reason the water delivered to plaintiffs' lands contains a higher salt content than the average water delivered to the Project as a whole is on account of the pumping of water into the canals serving the plaintiffs' lands, and because the average water delivered to plaintiffs' lands contains a higher percentage of pumped water than the average delivered to the Project as a whole.

"That on account of the salt content of the average water delivered to plaintiffs' lands, it is less desirable and not as valuable for irrigation purposes, either as river water or as the average water delivered to the lands of the Project as a whole.

"That the water delivered to plaintiffs' lands although less desirable may be used for irrigation if used in sufficient quantity, and the use of a larger quantity of water will accomplish the same result, or approximate the same result, as the use of river water. That the use of a larger amount of pumped than river water is necessary to accomplish or approximate the same result.

"That the use of the same amount of pumped water of the quality which was delivered to the plaintiffs' lands for irrigation as compared to the minimum amount of river water required to irrigate properly the same, would in time prove detrimental to said lands and the crops grown thereon. The evidence is indefinite as to the length of time required to produce such a result, so the court is unable to make findings as to the same. That there is no uniformity as to salt content in the various wells of the Association, nor is there any uniformity as to the amount of pumped water delivered to the various owners of land in the Project. That it is physically impossible to deliver a like quality of water to all lands of the Project, if the water developed from pumps is to be used for irrigation. That pump water is available in much greater quantities in certain parts of the valley, (including the Tempe District), where drainage is neces-

sary on account of the danger of waterlogging of some of the lands, and such water can only be used at or near the vicinity where the same is developed. . . .

"That the higher lands of the Project which do not need drainage are compelled to pay their proportionate part of the cost of keeping the lower lands drained, from which the higher lands receive no benefit. That if the Association were compelled to exhaust the river water before the use of any pumped water, the lower lands being the only ones capable of using the pumped water, would have sufficient water at all times, and the higher lands, being unable to use the same while forced to help pay for the pumping of the water, would be without water during a water shortage. That the only compensation to the higher lands for the money that they expend in the pumping of water is the added water supply as a result of the use of the pumped water on lands where it is available."

 Thus, it is seen that if the plaintiffs are put to any disadvantage, or suffer more than some others in the Project, it is due to natural and inherent causes. They get a higher percentage of pump water than the average because their lands are waterlogged and because the water is pumped from their lands or lands near by. Where the salt content is higher than the average, they get more salt than the average. The finding explains:

"That it is physically impossible to deliver a like quality of water to all lands of the Project, if the water developed from pumps is to be used for irrigation. That pump water is available in much greater quantities in certain parts of the valley, (including the Tempe District), where drainage is necessary on account of the danger of waterlogging of some of the lands, and such water can only be used at or near the vicinity where the same is developed."

The question is what should or can be done by the Association to overcome these natural obstacles and secure to plaintiffs their proportion of the river flow

and storage water, or their equivalent in efficiency, which apparently they are not now receiving. The pump water they are receiving is less desirable than the average delivered over the project as a whole. The language of the finding is

"the use of a larger quantity of water will accomplish the same result, or approximate the same result as the use of river water. That the use of a larger amount of pumped than river water is necessary to accomplish or approximate the same result."

The correctness of this finding is not questioned. It is based upon evidence to the effect that the delivery to lands of the Project of pump water in an amount equal to the amount of river water necessary for the irrigation of such lands will injure the lands by depositing the salt content thereon, but that if the pump water is of sufficient quantity to flood the land it will leach it of the salt and secure the same, or practically the same, crop results as the river water. It seems that there is an abundance of underground water, and that the pumping facilities of the Association are adequate to supply plaintiffs with sufficient water to "accomplish the same result . . . as the use of river water." We have no doubt the management of the Association, consisting, as it does, of practical dirt farmers, has and will utilize every facility it has to deliver to plaintiffs water of an equal quality to the river flow and storage; or if that is not possible, because of inherent natural causes, the Association will do the next best thing, to wit, deliver to plaintiffs greater quantities of pump water so that the deficiency in quality will be supplied by increased quantity. We do not feel that we should undertake, in the situation as we see it, to suggest what steps the Association should take to correct any inequalities, for we are sure the Association, with its experienced

farmers and engineers, is better qualified for that task than the members of this court or the judge of the trial court.

For the same reason we decline to suggest to the trial court the appointment of a water commissioner to supervise, under the court's direction, the preparation and delivery of plaintiffs' irrigation water. We take this stand because we feel that no person or persons, acting either independently or under the orders of the court, can perform the task as economically, efficiently and as well as the Association.

The evidence is far from convincing that the plaintiffs' present plight is worse than it was when they joined the Association in 1924. Some of their lands were badly waterlogged and had been for some time. They had voted a $125,000 bond issue and used the proceeds to construct a drainage canal through their lands, but it was not a success. They were using, and had been using, as heretofore shown in this opinion, large quantities of pump water for irrigation. So, the problem of drainage and the use of pump water for irrigation were familiar to the plaintiffs before they became shareholders of the Association. Since they are in the Association they should be accorded every right and privilege extended to other members, and we believe they are when the natural conditions are the same and where it is possible for them to enjoy such rights and privileges on the same terms as others. The plaintiffs no longer have to maintain their own diversion dams on the river nor their own irrigation system, nor a drainage system. These are burdens of the shareholders of the Association and all of the members of the Project. The plaintiffs, however, receive, according to the evidence, the profits realized by the Association from its power plants, some years as much as $6 per acre, which are applied on their

assessments, and are the recipients of electric power to develop water and for drainage.

Assignment five challenges the correctness of the court's conclusion of law as follows:

"That the defendant Association had the right to pump the underground waters from under the lands of its shareholders, including the lands of the plaintiffs herein, for the purposes set forth in the findings of fact."

It is said this conclusion assumes, contrary to the law, that the Association

"without compensation to or authority from or obligation or duty imposed upon appellants, has the right to pump and remove from within appellants' lands all water it may choose in excess of the quantity necessary for the drainage of said lands as permitted under the terms of the Tempe Contract."

Really, the objection to the court's conclusion is not that it is incorrect but that the right to pump underground water is not therein limited to the quantity necessary for drainage. In other words, it admits the Association's right to pump subsurface water to relieve or prevent water logging or to obtain water for use in irrigation, but claims that since the water in the ground is the property of the landowner the Association should be required to limit any drainage or pumping to the quantity necessary for drainage.

While the exact question was not involved in *Brewster* v. *Salt River Valley Water Users' Assn.*, 27 Ariz. 23, 41, 229 Pac. 929, 935, the principle was. In that case we said:

"In other words, it is contended that it is 'infiltrating or percolating water oozing through the soil beneath the surface in undefined and unknown channels, and therefore a component part of the earth, having no characteristic of ownership distinct from the land itself,' and consequently the property of the

owner of the soil. This is the rule in Arizona and generally. *Howard* v. *Perrin,* 8 Ariz. 347, 76 Pac. 460 (affirmed, 200 U. S. 71, 26 Sup. Ct. 195, 50 L. Ed. 374 [see, also, Rose's U. S. Notes]) ; especially where the water gets into the soil by natural processes, and perhaps also where the process is artificial as by irrigation or seepage from canals or ditches. If, however, it be determined that each shareholder of the Association is as much the owner of the water that forms in it from irrigation as he is of his land, still we think on account of his contractual relation, arising by virtue of his membership in the Association, he is or ought to be bound for the common good to surrender ownership and dominion of such water when the Association has concluded it to be to the best interests of all to drain the water out of the lands of the project. *Orme* v. *Salt River Valley Water Users' Assn.* [25 Ariz. 324, 217 Pac. 935], *supra.* As such owner has submitted by the terms of the charter to employ the Association to carry from the river and the reservoir, and distribute to his lands his proportionate share of irrigation water, in order that he may realize on his lands, so likewise when his land becomes so thoroughly saturated with water as not to be productive, he has consented that the same organization may 'construct, install, operate, and maintain pumps, ditches, conduits, and other drainage works, for draining any or all of the lands receiving water through the irrigation works of the Association.' ''

We again direct attention to the Tempe Contract and especially to the part thereof that states the ''General Purposes'' of the contracting parties in entering into the contract. We quote:

''The object and purpose . . . is to provide and execute a general plan for unified operation'' of the Project.

Thus, the scheme proposed was the adoption of a general plan of unified operation. Webster says:

''Plan is the general word for a proposed method of action or procedure.'' That *unify* means: ''To cause

to be one; to make into a unit; to unite. . . . To become one; to consolidate." And that *unified* means "made one."

The lands of the Project were by the Tempe Contract pooled, consolidated or united, as though they formed one natural contiguous body, for the purpose of developing water for irrigation and for drainage. The places where and the amount of water to be pumped were left to the sound discretion of the board of governors and the executive officers of the Association.

Under the Tempe Contract the Association is in duty bound to develop and pump underground water for irrigation and also for drainage purposes. In the performance of the former duty the Association selects the lands needing drainage so that by the same act both duties are performed. It is not contended that more pump water was taken from beneath plaintiffs' lands than was needed for irrigation purposes, or that the Association's pumping facilities enabled it to obtain such irrigation water from beneath other lands, or that the lay of the plaintiffs' lands would permit the maintenance of a stable or constant water level. The evidence is that a constant underground water level cannot be maintained, because of the contour of the land, without great expense. In view of these facts, the court properly refused to grant the plaintiffs' fourth prayer for relief.

Finally, we have not discussed separately all of the assignments of error but have considered the facts and the law raised by those not discussed in the ones we have discussed and considered.

This is an equity case and upon all the facts we are of the opinion that the equities preponderate in the defendant's favor.

For the foregoing reasons, we affirm the judgment of the trial court.

McALISTER, J., concurs.

LOCKWOOD, J., Dissenting.—There are two principal questions raised by the pleadings and evidence in this case, (a) is defendant wrongfully pumping water from under the lands of plaintiffs, and (b) is defendant failing to furnish irrigation water to plaintiffs' land as required by law?

So far as the first question is concerned, I agree with the majority of the court and the trial judge that the answer is no. These waters are percolating in their nature and not subject to the law of appropriation. The plaintiffs disposed of whatever rights they had therein by the Tempe Contract, and further, in my opinion, are estopped from objecting to defendant's pumping them as it has done since 1922, by virtue of a long acquiescence in such pumping.

But when we consider the second question, I cannot agree with the unconditional affirmance of the judgment of the trial court which the majority of this court has seen fit to make. I regret that this is true. But since, in my opinion, the portion of that judgment referring to the second question is not based on a correct application of the unquestioned law to the facts, and its effect is to take away the private property of one man for the benefit of another, without compensation therefor, I feel that I should express my dissent.

I desire first to state a few of the fundamental principles of water law as I believe they exist, and have always existed, in Arizona, even at the risk of repetition in part of what the majority has already said, for it is only by restating and arranging these prin-

ciples in a logical sequence that I can make my conclusions clear. The law of prior appropriation which governs the water of all running streams and lakes, whether surface or subterranean, in the state of Arizona is based upon the principle of "first in time, first in right," and all of our water law is, in substance, but an amplification and corollary of this principle. Stated more fully, the first man to apply a given quantity and quality of water to a specific tract of land for the purpose of irrigation is entitled to the continued use of such water in preference to any later appropriator, provided the amount so used is not more than is reasonably necessary for the proper cultivation of the land. This right is what is commonly called a "vested water right." It is not a right to the water itself, but to the use thereof, for the title to the water itself is always in the state as trustee for its citizens. It is attached inseparably, with one minor exception not involved in the present case, to the particular tract of land on which it is first used, and may not be sold, transferred or incumbered in any manner separate from the land to which it is appurtenant. It can only be lost by an abandonment of the use by the owner of the land. And if he abandons it, he cannot designate any particular person who, nor any land which, shall benefit thereby. It reverts to the state, and is again subject to appropriation in the same manner as it was originally, but the person who appropriates such abandoned water gets his right to the use thereof as of the date of *his* appropriation, and not that of the *original* appropriator. The situation may be illustrated by the line at a postoffice window where, if the man at the head of the line steps out, the balance of the line immediately moves up, and the man who has once lost his place must go to the foot. A subsequent appropriator may not

diminish the quantity, deteriorate the quality, nor increase the cost of application of the water to the lands of the first appropriator by any act of subsequent appropriation. This does not mean, however, that the prior appropriator is entitled to any specific water from any particular source. If a later appropriator can secure water from another source, or sources, and deliver it to the first appropriator in another manner, without an increased cost to such appropriator, he is at liberty to do so, with or without the consent of the first one. But the water so delivered must not only be equivalent in quantity but also in quality to the water first appropriated, and any interference by any person with a vested right as above described and set forth, may, and should, be enjoined in a proper action by the prior appropriator. I give no citations to support the foregoing principles, for they are elementary water law, and are not, as I understand it, questioned by the majority of the court. It is their proper application to the facts of the present case which I think has been overlooked.

Let us apply these principles to the present case. Before 1900 the vested water rights of the Salt River Valley, with the exception, perhaps, of a few unimportant ones not involved in the present controversy, were based on the natural flow of the Salt River below its confluence with the Verde. This stream fluctuated greatly in the amount of water which it carried. At its lowest in the summer there was not sufficient water to irrigate properly the lands already under cultivation at that time. At its maximum it has been known for a short period to equal almost half the flow of the Ohio River in flood. There were then no storage reservoirs in operation upon the Salt, nor any of its tributaries, and as a result immense quantities of water which, if properly stored, would

have been available for irrigation went to waste every year. To correct this situation, the government of the United States agreed to advance for the benefit of the landholders of the valley a sum sufficient to install a storage reservoir in the upper regions of the Salt River. As was said in the majority opinion, it found it convenient for this purpose to negotiate with a corporation, rather than with individual farmers, and the Salt River Valley Water Users' Association, the defendant herein, was organized. Its purpose primarily was to store the flood waters above referred to, but its charter also permitted it to supplement the existing canal systems of the valley for the purpose of delivering this stored water, to develop other water for irrigation, to generate and sell electric power, and to do a number of other things. The men who drew its articles of incorporation were undoubtedly perfectly familiar with the water law of Arizona, as above set forth, and recognized that the vested rights already existing could not be altered by the articles of incorporation, and that the farmers who already possessed such rights would never consent to surrender them and accept in lieu thereof rights to water to be stored in the future. They also knew that the corporation itself could acquire no vested right to the use of the stored water, but that such right must be acquired by the application of such water to specific lands, and that such appropriation when made was subject to the same rules of law as any other vested water right. But in order to reassure the farmers whom it was anticipated would become members of the association, a recognition of what was undoubtedly the existing law was expressly set forth in the charter of defendant:

"Art. XIV. Nothing in these Articles of Incorporation, or in the fact of becoming a member of this

Association, shall be construed as affecting, or intending to affect, or in any way interfere with the present vested rights of any person to the prior use, or delivery, of the natural appropriated flow of the waters of the Salt and Verde rivers."

And it was further stated in article 5, section 7, of the charter that the water which belonged to the landowner by virtue of such rights should be delivered to him by the association. It was further recognized by article 5, section 8, impliedly if not explicitly, that under the law the association did not, and could not, own the stored waters. Such water, before Arizona became a state, was owned by the federal government in its sovereign capacity, and necessarily when we acquired statehood that ownership passed to the state. The right to use the water could only be acquired by the beneficial application thereof to specific tracts of land, and the date of the appropriation was that of the application to the land. In other words, all of the shareholders of the association, who necessarily under the articles were landholders thereunder, acquired the right to use the stored waters when these waters were applied to their land, and such right accrued as of the commencement of the construction of the storage works, under the familiar doctrine of relation. This being the case, all the original shareholders became appropriators of the stored water, with the same date of priority and an equal right to the use of such water.

It was recognized that much of the land owned by the prospective shareholders of the corporation had already a vested right to the use of the natural flow, while other lands did not. It was apparent, therefore, that some of the shareholders would have two vested rights applying to the same land; one of an early date, being of the natural flow, and the other of a later time, of the stored water which is available only to supple-

ment the prior one in time of shortage of natural flow, while others would have nothing but stored water to which to look. It therefore, became necessary to determine just what the existing vested rights of the many thousands of shareholders were. This was done by means of a suit in the district court, and the rights declared as a result of that suit were set forth in what is commonly known as the "Kent decree." The court, in its decision, recapitulated and restated the water law of Arizona substantially as I have set it forth above, but with much greater detail. It divided the lands of the parties to the suit into three classes. The first is what is known as class "A" land. This consisted entirely of land which was found to have a vested water right in the natural flow, in accordance with the principles above set forth. The court carefully classified this land according to acreage, location and date of appropriation, running from the year 1869 down to and including 1909. It also found that certain lands had at one time been irrigated for a short period, but that the use of water thereon had been discontinued for longer than the period which, under our law, is considered as conclusive evidence of an abandonment of such right. These were classified as "B" lands. There was a third class of land which lay within the physical boundaries of the area which it was contemplated would be served by the defendant's project, but which had never been cultivated, classified as "C" lands. The court held, in substance, that the "A" and "B" lands had equal rights to make application for membership and to become shareholders in the defendant, and thereafter establish an appropriation of the stored water, while the "A" lands, in addition to the right to the use of such stored water, retained their vested rights as declared by the decree. The "C" lands were not permitted to apply for mem-

bership in the association until after the owners of the "A" and "B" lands had first exercised their rights, but thereafter, if it were deemed by the government that there was still sufficient storage capacity remaining to take care of the "C" lands, then the owners of the "C" lands might make application for, and receive, membership in the association. In other words, so far as the "A," "B" and "C" land rights in stored water are concerned, they were classified merely for the purpose of making application for membership in the association, but when once they became shareholders all who had been accepted before irrigation by stored water actually began participated equally in the use of such water.

In the year 1910, which was about the time when the stored water first actually became available for regular and constant use upon the land lying under the canal systems of the valley, there were two classes of land owned by the shareholders in defendant. The first was the class "A" lands, which had a vested right to the natural flow of the river, in accordance with the date of their appropriations, and also an equal right with all of the other shareholders to the use of the stored water so long as what they received of that water, added to whatever they were able to secure through their vested rights, did not exceed the quantity required for the proper irrigation of their land. The second was the class "B" and "C" lands which had been accepted for membership. These shared equally with each other and the class "A" lands in the right to use of the stored water. The maximum amount of water, therefore, which any member of the association was entitled to, including both his vested right in the natural flow and his vested right in the stored water, could never exceed the amount neces-

sary for the proper cultivation of his lands, but might be less.

For many years the association proceeded to distribute water in accordance with this rule. The natural flow as it fluctuated from time to time was divided among the class "A" lands in accordance with the date of their appropriation. In addition thereto, the stored water was divided on equal terms among all the members of the association, with the proviso that it, together with the natural flow water, did not exceed the amount necessary for the proper cultivation of any particular land, as aforesaid. The principle involved in this method of distribution is simple, and in strict accordance with the general water law of the state, but the exact method of applying it to the particular tracts of land required, and will continue to require, constant and careful supervision and classification by the managing officials of the association.

The holders of land under the Tempe canal did not become shareholders in defendant and acquired no vested rights in the stored water at the same time that most of the other landholders in the valley did, for the reason that most of these lands had vested water rights in the natural flow of an extremely early date. The landholders thereunder felt that they would always have enough water for irrigation from this flow, without the necessity of sharing the large expense of building and maintaining the dams and canals required by the defendant to carry out the purposes of its incorporation, and for many years they continued operating as they originally had, as a separate unit. Under the law, defendant was obliged to permit to flow to the Tempe canal water equivalent to the natural flow of the river as it existed when the appropriation for the landowners under such canal was initiated, before it was permitted to retain in its reservoirs any

water for storage. It was more economical and conserved the water for defendant, instead of allowing it to run down the river in sufficient quantity to meet the requirements of the Tempe canal, to take it out at Granite Reef and convey it to the head of the Tempe canal through the canal system of the defendant, and, as I have stated, the law permitted it to do this without the consent of the plaintiffs, the only requirement being that the water so delivered should be equivalent in quantity and quality to the natural flow, and at no greater cost to the plaintiffs. This practice went on until about the year 1922, and had it not been for one factor which had been overlooked by plaintiffs when they refused to become members of the defendant at the time of its organization, it would probably still be continued. The constant and increasing irrigation of the lands lying above those of plaintiffs caused an increase in the underflow and a raising of the water table under all of the valley, including the plaintiffs' lands. Due to the natural configuration of both surface and underground strata, the ultimate effect was that plaintiffs' lands began to waterlog. They tried to meet the situation by independent drainage and pumps, but were unable to do so, and for that reason entered into what is called the Tempe contract about 1922. By its terms, plaintiffs became members of the association, including in such membership all of their "A" lands and a considerable portion of lands which were classified as "B" and "C" lands under the Kent Decree. They agreed that the association should pump water from under their lands in such quantity as it saw fit, and that they would pay a certain amount of money to the association and turn over to it the Tempe canal system, and various other physical properties connected therewith, with some other provisions not necessary to refer to, and upon such conditions they became full fledged members of defendant, with all of

the duties, rights and privileges of such members. But they carefully reserved in such contract all of their vested rights to the use of water for irrigation. The legal effect of this contract was obviously that so far as the subterranean waters were concerned, as I have indicated above, the defendant became for all practical purposes the owner thereof, with the right to pump and use them as it saw fit, either for drainage or irrigation purposes. But this right was subject always, both by virtue of the Tempe contract and the articles of incorporation themselves, to the prior right of the class "A" lands in the Tempe project to have delivered to them irrigation water in accordance with their existing vested water rights in the natural flow and the right of all the "A," "B" and "C" lands in that project to have delivered to them such proportion of the stored waters as they might be entitled to under the law as hereinbefore set forth.

It is over the delivery of water in accordance with these vested rights that the second controversy in this suit is concerned. Plaintiffs contend that while the quantity delivered to them is substantially what they were entitled to if nothing else is considered, that the quality has been so changed for the worse that the ultimate effect of the delivery of such water is not equivalent to a delivery of the natural flow and stored water, in accordance with their vested rights, for the reason that it contains so much pumped water, carrying an excess of salts, that eventually their land will be ruined for cultivation.

It is clear that under the law as to the facts, as I have above set them forth, if it be true that defendant is delivering water which is inferior in quality to what plaintiffs would receive if their vested rights in the water were given them, that such delivery violates both the Tempe contract and the articles of incorporation of the association, and that the plaintiffs are en-

titled to injunctive relief, if no other method can be found of securing to them the rights to which they are entitled.

What was the conclusion of the trial court as to the ultimate fact? It found that plaintiffs were not receiving water of the character to which they were entitled, and that the effect of continued application of what they did get would eventually ruin their lands. If this be true, and under our rule we must accept this finding as being correct, how can a judgment be sustained which, in effect, says that the defendant should not be enjoined from continuing to violate its charter, the Tempe contract, and the law? Apparently the trial court realized that defendant was not complying with the law, but gave as a ground for the judgment that it was impossible for the defendant to deliver separately natural flow, stored water and pumped water, and that it could not be compelled to do the impossible. The fallacy in the decision is the apparent belief of the court that the defendant had no right to mix these waters, but must deliver the natural flow, stored water and pumped water of the river separately and in specie. As I have pointed out, the prior appropriator has no right to any particular water from any particular source. What he is really entitled to is such a quantity and quality of water as will produce the same results on his land, so far as agricultural production is concerned, as was produced by the water which he had appropriated and was using before the later appropriator came on the scene of action. It is obvious, if this be the rule, that the defendant is required to deliver such an admixture of water, regardless of the source, as will produce a result equivalent to what was produced by the waters to which plaintiffs were entitled at the time of their appropriation thereof. This, the court found, could be done very simply. It stated, in its findings, that the evidence showed that

while an inordinate proportion of pumped water for irrigation, such as the plaintiffs were receiving, would eventually ruin their land if applied only in the quantity of natural flow water and stored water which would be required for the purpose of successful agriculture, yet if the total quantity delivered was increased sufficiently so as to leach the salts deposited into the subterranean waters, the effect of this greater quantity on the land and on agriculture, would be equivalent to that of a lesser quantity of natural flow and flood water.

If these findings be correct, all that the defendant is required to do in order to deliver to the plaintiffs what they are entitled to, by reason of their vested rights, is to increase the total quantity of water delivered and to allow the water table under plaintiffs' lands to stand at such a level that the effect of the increased quantity of salt carried by the pumped water will be neutralized by the leaching of the land.

As I read the majority opinion, it agrees with me as to the fundamental water law of the state; it agrees that under this law and the facts of the case the plaintiffs are entitled to have delivered to them water in accordance with their vested rights, or else its equivalent in effect upon agriculture and their lands, of mixed water. It agrees, as it must under the findings of the trial court, that defendant is not doing its duty in this respect, but that it can do so with comparatively little difficulty. It would seem, if these things be true, that the next step is inevitable, and that defendant should be required to perform the duty imposed upon it by law. But the majority opinion at this point, to my mind, departs from law and logic, and says, in substance, notwithstanding the law as applied to the facts:

" . . . We have no doubt the management of the Association, consisting as it does, of practical dirt farmers, has and will utilize every facility it has to

deliver to plaintiffs water of an equal quality to the river flow and storage; or if that is not possible, because of inherent natural causes, the Association will do the next best thing, to wit, deliver to plaintiffs greater quantities of pump water so that the deficiency in quality will be supplied by increased quantity. We do not feel that we should undertake, in the situation as we see it, to suggest what steps the Association should take to correct any inequalities, for we are sure the Association, with its experienced farmers and engineers, is better qualified for that task than the members of this court or the judge of the trial court.''

In other words, the defendant has not done its duty in the past, but we will assume that it will do it in the future, and will, therefore, affirm the judgment of the trial court that it may continue its present course, and thus throw the costs of this action upon the plaintiffs.

With all due respect to the majority of the court, it seems to me that its conclusion is such a *non sequitur* that I must respectfully dissent from the order affirming the judgment *in toto*. What should be done is to modify the judgment by commanding defendant to deliver to plaintiffs the water to which they are entitled, or its equivalent, as required by law, but giving it a reasonable time to work out the best method of so doing, and retaining continuing jurisdiction of the case for the purpose of seeing that this is done.