773 P.2d 988

ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation; Salt River Project Agricultural Improvement & Power District, a political subdivision and an agricultural improvement district of the State of Arizona; Salt River Valley Water Users' Association, an Arizona corporation; City of Phoenix, an Arizona municipal corporation; City of Glendale, an Arizona municipal corporation; City of Scottsdale, an Arizona municipal corporation; City of Tempe, an Arizona municipal corporation; City of Mesa, an Arizona municipal corporation; Town of Youngtown, an Arizona municipal corporation; City of Tolleson, an Arizona municipal corporation; Southern California Edison Company, a California corporation; Public Service Company of New Mexico, a New Mexico corporation; El Paso Electric Company, a Texas corporation; Southern California Public Power Authority, a California Public joint powers agency; M–S–R Power Agency, a California joint powers agency; and the Department of Water and Power of the City of Los Angeles, a California municipal corporation, Defendants/Plaintiffs/Other Indispensable Parties–Appellees,

v.

John F. LONG; John F. Long Homes, Inc., an Arizona corporation; and John F. Long Properties, Inc., an Arizona corporation, Defendants–Appellants.

ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation, Defendants–Plaintiffs Cross Appellants,

and

Southern California Edison Company; Public Service Company of New Mexico; El Paso Electric Company; Department of Water and Power of the City of Los Angeles; and Southern California Public Power Authority, Defendants, Cross Appellants,

v.

John F. LONG; John F. Long Homes, Inc., an Arizona corporation; and John F. Long Properties, Inc., an Arizona corporation, Defendants–Appellants, Cross Appellees.

A TUMBLING T RANCHES, an Arizona partnership; William T. Gladden and Nicole L. Gladden, husband and wife; David L. Gladden and Sharon M. Gladden, husband and wife, Plaintiffs–Appellants,

v.

CITY OF PHOENIX, an Arizona municipal corporation; City of Glendale, an Arizona municipal corporation; City of Scottsdale, an Arizona municipal corporation; City of Tempe, an Arizona municipal corporation; City of Mesa, an Arizona municipal corporation; Town of Youngtown, an Arizona municipal corporation; City of Tolleson, an Arizona municipal corporation; Arizona Public Service Company, an Arizona corporation; Salt River Project Agricultural Improvement and Power District, an Arizona municipal corporation; Southern California Edison Company, a California corporation; Public Service Company of New Mexico, a New Mexico corporation; El Paso Electric Company, a Texas corporation; Department of Water and Power of the City of Los Angeles, a California municipal corporation; Southern California Public Power Authority, a California joint powers agency; M–S–R Public Power Agency, a California joint powers agency, Defendants–Appellees.

ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation; Southern California Edison Company, a California corporation; Public Service Company of New Mexico, a New Mexico corporation; El Paso Electric Company, a Texas corporation; Department of Water and Power of the City of Los Angeles, a California municipal corporation; Southern California Public Power Authority, a California joint powers agency, Defendants, Cross–Appellants,

v.

A TUMBLING T RANCHES, an Arizona partnership; William T. Gladden and Nicole L. Gladden, husband and wife;

**David L. Gladden and Sharon M. Gladden, husband and wife, Plaintiffs, Cross–Appellees.**

No. CV–86–0634–T.

Supreme Court of Arizona,
En Banc.

April 17, 1989.
Reconsideration Denied June 9, 1989.

Jennings, Strouss & Salmon by John B. Weldon, Jr., Stephen E. Crofton and M. Byron Lewis, Phoenix, Kevin J. Worthen, Brigham Young Law School, Provo, Utah, for defendants/plaintiffs/Other Indispens-

able parties/appellees Salt River Project Agricultural Improvement & Power Dist., Salt River Valley Water Users' Ass'n.

Bill Stephens & Associates by Bill Stephens, William H. Anger and Karen L. Tarr, Phoenix, for defendants/plaintiffs/appellees Cities of Phoenix, Glendale, Scottsdale, Tempe, Mesa, Youngtown and Tolleson.

Streich, Lang, Weeks & Cardon, P.A. by William S. Hawgood, II, Marcia Horn Yavitiz, Paula G. Kirby and Dale E. Pontius, Phoenix, for defendants/appellants/cross-appellees John F. Long, John F. Long Homes and John F. Long Properties.

Lewis and Roca by Tom Galbraith, Jessica H. Youle and Janet Napolitano, Robbins & Green, P.A. by Robert H. Green and Brian Imbornoni, Douglas C. Nelson, P.C. by Douglas C. Nelson, Phoenix, for plaintiffs/appellants/cross-appellees A Tumbling T Ranches, William T. Gladden, David L. Gladden, Nicole L. Gladden and Sharon M. Gladden.

Snell & Wilmer by Warren E. Platt, Robert B. Hoffman and Martha E. Gibbs, Phoenix, for defendants/appellees/cross-appellants Arizona Public Service, Dep't of Water & Power of Los Angeles; El Paso Elec. Co., Public Service Co. of New Mexico, Southern California Edison Co., Southern California Public Power Authority.

Frederick S. Dean, Tucson City Atty. by Loretta Humphrey, Tucson, for amicus curiae.

Fennemore, Craig by James W. Johnson, Bryan, Cave, McPheeters & McRoberts by Kathleen Ferris, Arizona Dept. of Water Resources by Elizabeth A. Rieke, Chief Counsel and Scot C. Stirling, Chief Litigator, Phoenix, for amicus curiae Arizona Dept. of Water Resources.

HOWARD, Court of Appeals Judge.

## I. THE ISSUES

This case involves the sale by appellee Cities to the appellee Utilities of sewage effluent. Two questions are posed: (1) Can the Cities contract to sell sewage effluent for use on lands other than those involved in the original appropriation? And (2) once the Cities dump sewage effluent into a stream and such effluent is appropriated by downstream users, must the Cities continue such dumping ad infinitum? We answer the first question in the affirmative and the second in the negative.

The Utilities have also filed a cross-appeal regarding certain language used by the trial court in its judgment. In view of our disposition and our holdings in this opinion, the cross-appeal is moot.

## II. RECUSAL ISSUE

While this appeal is limited to state water law issues, the Longs previously attacked the contracts involved here on municipal law grounds in the case of *City of Phoenix v. Long*, 158 Ariz. 59, 761 P.2d 133 (App.1988). In that case the trial court entered summary judgment and Division Two of the Court of Appeals affirmed the ruling on appeal. Because two of the judges of Division Two, who participated in that case, including the author of this opinion, are also sitting as Supreme Court justices in this appeal, and because a petition for review of *City of Phoenix v. Long, supra*, had been filed and was pending before the Supreme Court at the time oral argument was heard in this case, the Longs filed a motion suggesting that the Division Two judges should recuse themselves. Prior to oral argument this court, in conference, considered the Longs' motion and unanimously rejected it because the issues involved in *City of Phoenix v. Long, supra*, (whether the City could make a contract that would be binding for that length of time and whether the contracts were invalid for failure to comply with competitive bidding requirements) are not involved here. The reason that Justices Gordon and Holohan recused themselves is set forth in the order which is reproduced in the appendix.[1]

---

1. To date, no Arizona case has discussed judicial disqualification because of a judge's possible financial interest in the litigation. Believing that the court's policy on that issue should be on record, we take this opportunity to publish in the appendix the "recusal order," which not

## III. FACTS

### A. *The Contracts*

This litigation concerns two contracts for the sale of sewage effluent. The first was entered into in 1973 when the Utilities were planning a nuclear power project to be located in Arizona (Palo Verde). Because the Utilities were required to secure an adequate supply of water for the construction and operation of the plant, they contracted with the Cities (except the City of Tolleson) to purchase an option to obtain sewage effluent once the various units of the power plant began operation. The agreement was structured as four options, one for each of the originally planned Palo Verde generators, totalling 140,000 acre feet per year. The agreement terminates four years after the exercise of the fourth option, which is exercisable until December 31, 1999. The Utilities exercised the first two options in February and December 1982 for a total of 70,000 acre feet. As a result of the deletion of the fourth reactor and changes in the design of the cooling systems for the remaining reactors, Palo Verde's water needs under current plans appear to be in the range of 64,050 acre feet per year.

The Utilities entered into a second agreement for the purchase of sewage effluent with the City of Tolleson approximately eight years later, in 1981. Under that agreement Tolleson has committed to the Utilities an additional 9,282 acre feet of sewage effluent from its treatment plant. The sewage effluent is transported by pipeline to approximately 50 miles west of Phoenix for use as a cooling agent at the Utilities' Palo Verde Nuclear Generating Station. As indicated in *City of Phoenix v. Long, supra,* since entering into the effluent purchase contracts, the Utilities have spent some $290,000,000 to construct both a pipeline for the delivery of effluent from the treatment plants to the Palo Verde site, and a plant to further treat the effluent so that it can be used as a coolant.

### B. *The Parties*

A Tumbling T Ranches owns the Enterprise Ranch, located on the Gila River approximately 20 miles southwest of Buckeye, Arizona. The Salt River is an upstream tributary of the Gila. It is alleged that much of the irrigation water used on the Enterprise Ranch is obtained from diversion of Gila River stream flow under decreed appropriative rights adjudicated and established in 1958. A Tumbling T asserts that in recent years most of the water diverted to satisfy its appropriative rights has been treated sewage effluent discharge by the Cities (except Tolleson) from the Cities' municipal treatment plants located on the Salt River at 23rd Avenue and 91st Avenue, above the confluence of the Salt and Gila Rivers. A smaller part of treated effluent also allegedly has been contributed by Tolleson's plant.

The Gladdens own the Hassayampa Ranch, located approximately 10 miles southwest of Buckeye. The ranch straddles the Hassayampa River above its confluence with the Gila. The Hassayampa Ranch's irrigation water allegedly comes from stream water diverted by the Buckeye Irrigation Company based on appropriative rights adjudicated in 1917. Again, it is asserted that most of the water supplied by the Buckeye Irrigation Company for its use on the Hassayampa Ranch has been treated sewage effluent discharged by the Cities from the 23rd Avenue and 91st Avenue plants and from Tolleson's treatment plant.

Because of the location of the system utilized to effect delivery of effluent from the Cities to the Utilities, the effluent is no longer discharged into the stream for appropriation by the ranches. Any return after use by the Utilities is made downstream from the ranches.

John F. Long and two of his corporations, John F. Long Homes, Inc. and John F. Long Properties, Inc., are also parties to this appeal. The Longs do not profess to own any junior appropriative water rights that would be damaged by the sale of sew-

only explains the reasons for recusal but, more importantly, the standards this court applies.

age effluent[2] but are major developers of residential commercial real property in the Phoenix area.

The parties agree that sewage effluent that the Cities treat at their treatment plants originates from a combination of both ground and stream water. The water is distributed by the Cities to the various individual industrial users within their service areas. The stream water comes from the Salt and Verde Rivers, and is initially distributed to the Cities' water filtration plants by the Salt River Valley Users' Association (the Association). The Association was organized in 1903 to finance, operate, and maintain a federal reclamation project (the Salt River Reclamation Project). The appropriative rights of the lands receiving water from the Association were adjudicated in 1910.

The Association delivers water to the Cities under various domestic water agreements. These agreements generally provide that as lands go out of cultivation, the Cities, rather than individual landowners, pay the Association the annual assessment for urban acreage which is no longer irrigated. In turn, the water appurtenant to this urban acreage is delivered by the Association to the Cities' various water filtration plants. Under these agreements, the Cities receive this water as agents for the landowners and deliver it to the land to which it is appurtenant. The Cities receiving water from the Association under the domestic water agreements include Phoenix, Glendale, Scottsdale, Tempe and Mesa.

Thus, the appropriative rights through which the Cities receive the stream water component of their municipal water requirements have generally originated as irrigation rights. However, once the waters have been introduced into the Cities' water systems, there is no indication in the record that the use of the water is limited to any specific lot or homeowner's parcel to which the right was originally appurtenant. Rather, the water becomes part of each city's water supply as a whole, to be used by the city's customers in accordance with the water use policies adopted by that city. Thus, while we have not been advised that these water rights have been changed from irrigation rights to rights for municipal purposes, it is apparent that they must be treated as such. As characterized by one of the parties in its brief filed in this appeal, the water rights have, through custom, been converted to municipal uses. *But see* A.R.S. § 45–172.

## IV. THE PROCEEDINGS IN THE TRIAL COURT

This litigation involves two separately filed actions which were later consolidated by order of the trial court. Eventually both the A Tumbling T parties and the Longs filed motions for summary judgment. After responses and the filing of cross-motions for summary judgment by the Cities, Arizona Public Service, and the Salt River Project, the trial judge issued a minute entry decision granting summary judgment in favor of the Cities and Utilities on the ground that the effluent which is the subject of the sales contracts is not subject to regulation under the surface water or groundwater laws of the State of Arizona and that the contracts were therefore not void. We affirm the decision of the trial court but not entirely on the same grounds.

## V. THE CONTENTIONS OF THE PARTIES

The Longs argue that the sale of the groundwater component of the sewage effluent is invalid because the performance of the effluent contracts would violate statutory restrictions on this transportation of groundwater. *See* A.R.S. §§ 45–541 to 45–545. They contend that the groundwater element of the effluent must be put to reasonable and beneficial reuse for the benefit of the land from which it was withdrawn, and, if reuse is not possible, the effluent must be returned to the common

---

**2.** The A Tumbling T parties have filed a motion to dismiss the Longs' appeal of stream water issues, contending that the Longs lack standing in that regard. At the time of oral argument, we denied the motion. In view of our disposition, we will not address it further in this opinion.

supply, by discharging it into a stream and allowing it to percolate into the ground.

The A Tumbling T parties argue that allowing the Cities to sell appropriable water that is not consumed by the Cities' beneficial use departs from a basic premise of Arizona law governing appropriable surface waters. Citing A.R.S. § 45–141(A), they urge that appropriable surface waters belong to the public, and that the Cities by their appropriation do not gain ownership of the appropriated waters so as to give them a right to sell the unconsumed effluent. Rather, it is urged that the Cities have only the right to the use of the water, limited by the purpose for which the appropriation was made. *See* A.R.S. § 45–141(A); *Adams v. Salt River Water Users Association,* 53 Ariz. 374, 89 P.2d 1060 (1939); *Slosser v. Salt River Canal Company,* 7 Ariz. 376, 65 Pac. 332 (1901); *Salt River Valley Users Association v. Kovacovich,* 3 Ariz.App. 28, 411 P.2d 201 (App.1966), and that any unused surface water must be returned to the river bed.

The Cities and Utilities argue that effluent is water which has essentially lost its character as either ground or surface water and becomes the property of the entity which has expended funds to create it. The Cities and Utilities further argued that they are the owners of the effluent and may dispose of their property in any way they see fit.

The Department of Water Resources has filed an amicus brief in which it agrees with both A Tumbling T and the Longs.

## VI. THE LAW

### A. *The Validity of the Contracts*

█ In order to decide this issue we find it unnecessary to categorize sewage effluent as being either surface water, groundwater, or both. Until such time as it is returned to the ground as either groundwater or surface water, it is nothing more than sewage effluent, which was described in *City of Phoenix v. Long, supra,*

as "a noxious bi-product of the treatment of sewage which the cities must dispose of without endangering the public health and without violating any federal or state pollution laws." [3] 158 Ariz. at 63, 761 P.2d at 137. More importantly, our statutes define effluent separately from either ground or surface water. *See* A.R.S. § 45–402(6). Nor does case law support the proposition that effluent can be broken down into separate components of surface and groundwater. A Tumbling T cites *Pulaski Irrigation Ditch Co. v. City of Trinidad,* 70 Colo. 565, 203 P. 681 (1922), an en banc decision in which two justices dissented and one did not participate. We are not persuaded by the analysis of that case. There the city had purified the sewage and was selling it. The court recognized that when the situation is such that the city cannot turn the sewage into the stream without causing a health hazard, the city must find some other way of disposing it. But, once the city purifies it, the water must be returned to the stream because the water element of the sewage always belongs to the public. It is not clear from the decision what the state of purity of the water was. In the case sub judice the water has been treated, but not puri and the discharge of such sewage effluent into a stream is subject to control by the state and federal governments. *See* A.R.S. § 49–201 *et seq.*

We find the analysis in *Wyoming Hereford Ranch v. Hammond Packing Company,* 33 Wyo. 14, 236 P. 764 (1925), a case in which the issues are on all fours with ours, more persuasive. In discussing the validity of the city's contractual disposition of its sewage effluent, the court stated:

> It is well known that the disposition of sewage is one of the important problems that embarrass municipalities. In order to dispose of it without injury to others, a city may often be confronted with the necessity of choosing between several different plans, and in the selection of the plan to be followed we think it should be permitted to exercise a wide discre-

---

**3.** The possible clash between concepts of western water law and the directives of environmental protection statutes was noted in the case of

*Thayer v. City of Rawlins,* 594 P.2d 951 (Wyo. 1979).

tion. In determining how it will make proper disposition of that which may be termed a potential nuisance, we think the city should not be hampered by a rule that would always require the sewage to be treated as waste or surplus waters. Sewage is something which the city has on its hands, and which must be disposed of in such a way that it will not cause damage to others. It would often be considered the height of efficiency if it could be disposed of in some other manner than by discharging it into a stream. Even in this state, where the conservation of water for irrigation is so important, we would not care to hold that in disposing of sewage the city could not adopt some means that would completely consume it. It might, we think, be diverted to waste places, or to any chosen place where it would not become a nuisance, without any consideration of the demands of water users who might be benefitted by its disposition in some other manner. In providing such a place, the city might acquire the right to discharge the sewage on the lands of any person willing to suffer such a use of his lands, and we see no reason why this right might not be gained by the city in consideration of the landowner's right to use or dispose of the sewage in any lawful way.

236 P. at 772.[4] The Wyoming court held that the sale by Cheyenne of sewage effluent that was discharged directly into the buyer's ditch was valid, but that portion of the effluent that was discharged into a creek was public water subject to appropriation. However, the court did not discuss whether the City of Cheyenne was obliged to continue dumping part of its sewage into the creek in order to satisfy the needs of the plaintiff.

We hold that the Cities can put its sewage effluent to any reasonable use that it sees fit.[5] This will allow municipalities to maximize their use of appropriated water and dispose of sewage effluent in an economically feasible manner. It also provides a degree of flexibility that is essential to a city's ability to meet federal and state environmental and health standards.

### B. *Statutory Regulations*

We agree with the trial judge's conclusion that sewage effluent is not subject to regulation under the Surface Water Code or the Groundwater Code. The 1980 Groundwater Code defines "effluent" as "water which, after being withdrawn as groundwater or diverted as surface water, has been used for domestic, municipal or industrial purposes and which is available for reuse for any purpose, whether or not the water has been treated to improve its quality." A.R.S. § 45–402. We agree with the trial judge that one can only conclude by this definition that effluent is something *other* than groundwater or surface water.

Another indication that the legislature considered effluent to be something other than groundwater or surface water is A.R.S. §§ 45–514 and 45–515, which provide that permits for groundwater may be conditioned upon the availability of either effluent or surface water. Furthermore, the legislature has expressly authorized more municipal entities to dispose of effluent by sales, see A.R.S. § 45–494(2)(c), without suggesting that such effluent is either surface water or groundwater.

Further, "effluent" is not defined in the chapter of the code dealing with surface water; the chapter does define surface water ("waters ... subject to appropriation") in a manner that does exclude effluent until it is "flowing in streams ..." *or* standing "on the surface." A.R.S. § 45–141(A).

Finally, the legislature has enacted numerous statutes regulating effluent from a health standpoint. *See* A.R.S. §§ 36–132 *et seq.* and A.R.S. §§ 49–201 *et seq.* There is nothing in these statutes indicating an in-

4. See also *Reynolds v. City of Roswell,* 99 N.M. 84, 654 P.2d 537 (1982).

5. Although the effluent is neither groundwater nor surface water, the common law requires, absent any legislative directive to the contrary, that even effluent be put to a reasonable use if it is not returned to the stream bed.

tent to also regulate effluent under the Surface Water Code or the Groundwater Code.

We concede that given the importance of water management in Arizona, one would expect that the legislature would not adopt a comprehensive code covering management of water resources without also regulating the use of effluent. Yet the revised code on water resources (A.R.S. Title 45) contains no explicit regulation of the use or management of effluent. Neither does it contain any clear definitional section that would embrace effluent under either the surface water or groundwater articles.

Of course, each of the parties and amici in this case is able to find some indication in Title 45 of what the legislature must have meant. We find it almost impossible to believe, however, that if the legislature had intended to manage, restrict or regulate the use of municipal effluent, it would not have done so explicitly by adopting a regulatory statute or at least including effluent within the definition of groundwater (*see* A.R.S. § 45-101(4)) or of the type of water subject to appropriation (*see* A.R.S. § 45-141(A)).

Absent any explicit undertaking by the legislature, the parties' submittals regarding construction of the extant statutes are actually invitations to create a regulatory system for effluent by judicial decision. We decline that invitation for several reasons. There is no body of case law dealing with rights to and the use of effluent. Research by counsel and the court has produced, at best, two or three outdated cases dealing with rights to the type of effluent with which this case is concerned. Principles that have evolved from cases dealing with runoff from a miner's sluice or a homesteader's irrigation ditch are not necessarily relevant to determining the rights to or management of effluent from the municipal sewer systems of all the cities in a valley populated by several million people. Further, in "ordinary" tort or contract cases, we build on a body of case law—the trial and error experience of generations of our predecessors. We occasionally adjust, modify, or advance a bit by announcing a new rule to which society may gradually adjust or which may be further regulated or in some cases actually repealed by the legislature. Regulation of water use, however, especially in a desert state, does not lend itself to case-by-case definition. In this field, we not only confer private rights and interests but deal in the very survival of our society and its economy. Simply put, there is not enough water to go around. All must compromise and some must sacrifice. Definition of those boundaries is peculiarly a function for the legislature. It is plainly not a judicial task. Accordingly, we must look to the legislature to enact the laws they deem appropriate for wise use and management of what may be a valuable water resource for Arizona.

## C. *Ownership of Effluent*

█ We do not agree with the contention of the Cities and Utilities that the Cities own the sewage effluent. In Arizona, being a desert state, water is a precious commodity. One does not own water in Arizona. One only has the right to put it to beneficial use. This applies to both surface water, see A.R.S. § 45-151(A) and (B), and groundwater. *See Town of Chino Valley v. City of Prescott*, 131 Ariz. 78, 638 P.2d 1324 (1981). Thus the legislature has the right to control the use of sewage effluent. It has not restricted its use and, until it does, the Cities have the right to enter into contracts as they have done here.

█ Nor is the effluent "developed" water. "Developed" waters are not public waters, and generally are not subject to prior appropriation. *See Fourzan v. Curtis*, 43 Ariz. 140, 29 P.2d 722 (1934). As applied to water in a stream system, "developed" water is that which has been added to the supply of a natural stream and which never would have come into the particular stream system in the absence of the effort of the developers. *See Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.*, 187 Colo. 181, 529 P.2d 1321 (1974). Since a return of the effluent to the stream bed would not increase the flow of the water above that

before it was diverted, the effluent is not developed water.

### D. *Must the Cities Continue Dumping Sewage Effluent In Order to Satisfy the Needs of Downstream Users?*

We start with A.R.S. § 45–141(A) which states:

The waters of *all sources*, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, *waste or surplus water*, and of lakes, ponds and springs on the surface, belong to the public and are subject to appropriation and beneficial use as provided in this chapter.

(Emphasis added.) A.R.S. § 45–151(A) provides that "[t]he person or the State of Arizona or a political subivision thereof first appropriating the water shall have the better right."

Can a downstream user appropriate the sewage effluent component of water under A.R.S. § 45–141(A)? We hold that he can. The statute speaks of water "of all sources." It does not matter where the water came from. Once it is in one of the geological or topographical features enumerated by the statute it is subject to appropriation. *See Wyoming Hereford Ranch v. Hammond Packing Company, supra.* The trial court was therefore incorrect in concluding that effluent was not subject to appropriation under the laws pertaining to surface waters.

But does this mean that the Cities must continue to discharge sewage effluent into the river to satisfy the needs of these appropriators? Certainly there are no statutes which require the Cities to do so. The ramifications of such a doctrine are alarming. For example, if we follow the path urged by A Tumbling T and the Longs, the Cities would be unable to change the location of its point of discharge without risking a lawsuit.

Sewage effluent is water that is left over after having been put to use. A.R.S. § 45–402(6). Regardless of whether the water used to treat sewage was originally groundwater or surface water, the water remaining after treatment is waste water. *Reynolds v. City of Roswell,* 99 N.M. 84, 654 P.2d 537 (1982).

Two early Arizona cases dealt with the appropriation of waste waters. In *Lambeye v. Garcia,* 18 Ariz. 178, 157 Pac. 977 (1916) and *Wedgworth v. Wedgworth,* 20 Ariz. 518, 181 Pac. 952 (1919), this court considered issues relating to rights that might be obtained by subsequent users of irrigation waste waters (sometimes also referred to as "surplus" water in both decisions). Neither *Lambeye* nor *Wedgworth* involved an appropriator's right to divert and use waste waters from a natural channel. Instead, the waste water had been captured and used by a subsequent user who had no appropriative rights before it had returned to a natural channel. On these facts we held that the waste water was not subject to appropriation and that the subsequent user could obtain no vested rights in it. We noted that one who captures waste water may not insist that the initial appropriator continue to waste his irrigation water and, accordingly, that the supply of waste water could be discontinued or withdrawn at any time.

Our holdings in *Lambeye* and *Wedgworth* were codified shortly thereafter by an amendment of the Arizona statute governing surface waters so as to reflect that "waste or surplus waters" were subject to appropriation only when flowing in a natural channel. *See* 1921 Ariz.Sess.Laws, ch. 64 § 1. We do not believe that the amendment of A.R.S. § 45–141(A), considered in conjunction with 45–151(A), has changed the conclusion that we reached in *Lambeye* and *Wedgworth* concerning the right of the initial appropriator to discontinue or withdraw his waste. The very nature of waste water requires the application of different rules governing the rights of the junior appropriator. Waste water exists only as long as there is waste. No appropriator can compel any other appropriator to continue the waste of water which benefits the former. If the senior appropriator, through scientific and technical advances, can utilize his water so that none is wasted,

no other appropriator can complain. *See Reynolds v. City of Roswell, supra; Bower v. Big Horn Canal Association,* 77 Wyo. 80, 307 P.2d 593 (1957). The junior appropriator, using waste water, "takes his chance" on continued flow. *Thayer v. Rawlins,* 594 P.2d 951 (Wyo.1979). To hold otherwise and require the Cities to continue to discharge effluent would deprive the Cities of their ability to dispose of effluent in the most economically and environmentally sound manner, as discussed above. Moreover, such a holding would be contrary to the spirit and purpose of Arizona water law, which is to promote the beneficial use of water and to eliminate waste of this precious resource.

We therefore hold that the Cities may discontinue the discharge of sewage effluent without violating the rights of those persons or entities which have previously appropriated it. The right to appropriate effluent comes into existence only when and if that effluent flows in the geological structures described in A.R.S. § 45–141(A). Because the "producer" of the effluent is a senior appropriator, those who have appropriated the effluent gain no right to compel continued discharge.

### E. *Abandonment of the Right to Use the Water*

■ One more area of our statutory scheme relative to surface waters must be covered. Did the Cities abandon the effluent by previously dumping it into the river bed? A.R.S. § 45–141(C) states:

> When the owner of a right to the use of water ceases or *fails to use* the water appropriated for five successive years, the right to the use shall cease, and the water shall revert to the public and shall again be subject to appropriation.

(Emphasis added.) A.R.S. § 45–188 provides:

> Any person entitled to divert or withdraw public waters of the state through an appropriation authorized under § 45–151, court decree, previous possession or continued beneficial use *who abandons the use thereof, or who voluntarily fails, without sufficient cause, to*

*beneficially use* all or any part of the right to withdraw for any period of five successive years shall relinquish such right or portion thereof. The rights relinquished shall revert to the state, and the waters affected by such rights shall become available for appropriation to the extent they are not lawfully claimed or used by existing appropriators.

(Emphasis added.) These statutes apply when an appropriator fails to withdraw some or all of the water to which he is entitled. That is not the case here.

### CONCLUSION

In summary, we hold that the effluent in question is neither groundwater nor surface water. Whether diverted by appropriation or withdrawn from the ground, after use by the municipalities the water loses its original character as groundwater or surface water and becomes, instead, just what the statute describes—effluent. *See* A.R.S. § 45–402(6). The Cities' expenditure of tens if not hundreds of millions of dollars for sewer lines, purification plants and equipment does not transform the water and change it back into groundwater or surface water. It remains effluent.

Neither the statutes dealing with groundwater nor those dealing with appropriation of surface water control or regulate the Cities' use or disposition of effluent. Thus, the Cities are free to contract for the disposition of that effluent and the utilities, having purchased the right to use the effluent, may continue to use it.

However, while effluent is neither groundwater nor surface water, it is certainly water. In this state, the constitution having abolished the riparian doctrine, *see* Ariz. Const. art. 17, § 1, neither stream nor groundwater is private property free from regulation. Those who lawfully appropriate or withdraw water have only the right to use it in accordance with the law. The legislature is free to regulate or control the use and disposition of effluent. We invite its attention to that need.

Thus, the downstream appropriators such as A Tumbling T have limited rights

as against the Cities. So long as the Cities choose to dispose of the effluent by discharge into the stream bed, the effluent becomes and is water "flowing in a stream" and under A.R.S. § 45–141 is subject to appropriation by downstream users. As between such appropriators, first in point of time is first in right under A.R.S. § 45–151(A), and A Tumbling T may well have appropriative rights as against any other junior appropriators. However, such downstream appropriators cannot force the Cities to continue to discharge the effluent at the same point in the stream or in the stream at all. The Cities may thus change the location of their sewer lines and of their water purification and treatment plants or dispose of their effluent in some other manner without violating any obligation or duty owed to the downstream appropriators.

We therefore affirm the judgment of the trial court.

FELDMAN, V.C.J., CAMERON, J., and LACAGNINA, Court of Appeals Judge, concur.

### APPENDIX

(Order Entered by the Supreme Court on December 29, 1987)

1. Subsequent to argument in this case, Justice William A. Holohan received an inheritance of shares of stock in one of the corporate parties. He informed the Court of this and has now confirmed the information by memorandum dated December 8, 1987. The information from Justice Holohan caused Chief Justice Frank X. Gordon, Jr. to reassess his participation in the case because he also owns, in his own name and in his name as custodian for his grandchildren, a small amount of stock in the corporate parent of one of the corporate parties.

2. The Code of Judicial Conduct provides two separate tests for judicial disqualification as the result of financial interest. The first test is contained in Canon 3(C)(1)(c) of the Arizona Code of Judicial Conduct, which provides that a judge shall recuse himself when he "has a financial interest ... in a party to the proceeding."

Subsection 3(C)(3)(c) defines "financial interest" as "ownership of a legal or equitable interest of substance." Such an "interest of substance" consists of any interest in a closely held corporation and in a publicly held corporation is an "interest, the value of which is likely to be increased or decreased to any material extent by the outcome of the litigation." *Id.*, subsection 3(C)(3)(d).

The second test for disqualification as the result of financial involvement is contained in Canon 3(C)(1)(c), which provides that a judge shall disqualify himself when he or she owns an interest that "could be substantially affected by the outcome of the proceeding."

3. In addition, A.R.S. § 38–503(B) requires public officers, including judges, to disqualify themselves in any matter in which they have a "substantial interest." This is defined as any interest "other than a remote interest." *See* A.R.S. § 38–502(11). With regard to stock interests, a "remote interest" is defined as a holding of "less than three per cent" of the corporation's stock, providing the dividends or other payments made to the judge by the corporation do not exceed five percent of the judge's total annual income. A.R.S. § 38–502(10)(e).

4. The Court has always taken the position that the more stringent requirements of the Code of Judicial Conduct must be applied as the test for disqualification. However, the Court has also noted that the test adopted by our Code of Judicial Conduct is different from and not as stringent as the standard applicable to federal judges by virtue of 28 U.S.C. § 455, which requires disqualification where the judge has "ownership of a legal or equitable interest, however small" in a party to the litigation. *Id.* § 455(b)(4). *See also* Frank, *Commentary on Disqualification*, 1972 UTAH L.REV. 377, 384. The federal rule, which is "draconian" in its results, has been severely criticized. *See* Nevels, *Bias and Interest: Should They Lead to Dissimilar Results in Judicial Qualification Practice?*, 27 ARIZ.L.REV. 171 (1985).

5. Noting the difference between the federal rule and the state rule, members of this Court have in the past sat on or participated in cases even though they owned small amounts of stock in publicly held corporate parties, so long as their interests could not have been substantially affected by the outcome of the case and so long as the value of their stock could not have been increased or decreased to any material extent by the result of the case. Cases of this sort have usually been those involving the routine business operations of a corporate party.

The nature of the instant case is quite different from routine business operations. It is quite possible that a corporate party to this case might be substantially affected by the outcome or that the value of a judge's share in a corporate party might be increased or decreased to some material extent by the result of this case. Therefore, both Justice Holohan and Chief Justice Gordon have recused themselves and will not participate further in the decision of this matter.

Judge Donald F. Froeb, who also participated in the case at the time of oral argument, previously notified the Court that one of his relatives had taken employment with a party connected to the case and that, as a result, he felt he must also recuse himself. Further, Justice Moeller was the trial judge who heard the case at the trial court level.

In light of the foregoing, therefore,

IT IS ORDERED that pursuant to art. 6, § 3 of the Arizona Constitution, Chief Judge L. Ray Haire of Division One of the Court of Appeals and Chief Judge Michael A. Lacagnina and Judge Lawrence Howard of Division Two of the Court of Appeals are designated to sit on the case and participate in the decision.

IT IS FURTHER ORDERED that the case will be rescheduled for oral argument at the earliest possible date.

Dated this 29th day of December, 1987.

HAIRE, Court of Appeals Judge, concurring in part and dissenting in part:

To a large extent, I concur in the result reached by the majority, but not in the legal analysis that the majority uses to arrive in that result. My major disagreement with the result reached by the majority concerns surface water issues resulting from the Cities' historical practice of discharging effluent into the Salt River Channel. I would hold that the right to dispose of sewage effluent by sale is included within the concept of full beneficial use of surface water and is not precluded by Arizona's surface water or groundwater codes, and that therefore the subject contracts do not violate Arizona groundwater or surface water law.[1] However, I would further hold that a city's surface water appropriative rights could be diminished if the city has failed to make full consumptive use of the appropriated water for five successive years as provided by A.R.S. §§ 45–141(C) and 45–188. Accordingly, I would reverse the judgment entered by the trial court and remand this matter for further consideration of the surface water abandonment issues.

Much of my disagreement with the majority occurs as a result of a difference in approach to the issues presented in this appeal. The majority focuses on the end product rather than on the rights gained and the limitations imposed on the Cities by reason of their initial appropriations. Without question, Arizona's surface water code governs those appropriations, and subjects them to the prior appropriation and beneficial use doctrines. Since the water when taken is subject to beneficial use limitations, the real issue becomes whether, consistent with beneficial use limitations, the water components of the sewage effluent can be sold by the Cities. The majority fails to resolve this basic issue, but rather focuses on the end product, sewage effluent, and treats it without regard to the principles governing the use and disposition

---

1. The conclusions which I state in this dissent concerning effluent are limited to sewage effluent of the nature involved in this litigation, and are not necessarily applicable to other categories of effluent as broadly defined in A.R.S. § 45–402(6).

of the effluent's groundwater and surface water components. From this premise the majority then concludes that effluent is not subject to regulation under Arizona's groundwater and surface water codes.

Because I am convinced that many of the legal conclusions reached by the majority are accordingly erroneous, I have set forth in some detail the legal analysis that supports the conclusions I have reached in this appeal.

## CHARACTERIZATION OF THE FLUID COMPONENTS OF SEWAGE EFFLUENT

In determining the legal rights of the parties relating to the sewage effluent that is the subject of this litigation, initial consideration must be given to the different classifications of water that contribute to the fluid content of the effluent. The principal contributions are from two sources—appropriable surface waters and groundwaters. The majority concludes that, whether diverted by appropriation or withdrawn from the ground, the water loses its original character after use by the cities and becomes instead, just effluent. For the following reasons I disagree.

In this dissent, I use the terms "appropriable surface waters", "surface water" and "stream water" interchangeably, to describe the limited types of waters that are subject to prior appropriation and the doctrine of beneficial use under Arizona law, pursuant to A.R.S. § 45–141(A):

"A. The waters of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, waste or surplus water, and of lakes, ponds and springs on the surface, belong to the public and are subject to appropriation and beneficial use as provided in this chapter."

The term "groundwater" is used in this dissent in the same sense as used in Arizona's Groundwater Management Act of 1980, as defined in A.R.S. § 45–101(4):

"4. 'Groundwater' means water under the surface of the earth regardless of the geologic structure in which it is standing or moving. Groundwater does not include water flowing in underground streams with ascertainable beds and banks."

In prior Arizona decisional law, groundwater is generally referred to as "percolating" water and is not subject to the doctrine of prior appropriation. *See Bristor v. Cheatham,* 75 Ariz. 227, 255 P.2d 173 (1953).

It is apparent from the provisions of A.R.S. § 45–141(A) that in Arizona not all waters appearing on the surface are subject to appropriation. *See, e.g., Fourzan v. Curtis,* 43 Ariz. 140, 29 P.2d 722 (1934) (developed spring waters are not subject to appropriation); *Espil Sheep Company v. Black Bill & Doney Parks Water Users' Association,* 16 Ariz.App. 201, 492 P.2d 450 (1972) (diffused surface waters are not subject to appropriation). With this premise in mind, the Cities and Utilities have urged that because sewage effluent is not among the appropriable waters specifically described in § 45–141(A), the effluent must be considered as privately owned and not subject to the limitations on use and disposition imposed by the beneficial use and prior appropriation doctrines. They initially contend that sewage effluent should be perceived as something separate and apart from the groundwater and surface water components from which it originates and, accordingly, that the rights of the parties should not be determined by the application of principles derived from surface or groundwater law. The majority apparently accepts this contention. I would reject it.

First, a fundamental premise of Arizona water law is that water is characterized as surface water, groundwater or otherwise at the time of its capture and retains that character until it is either returned to the stream (or some other surface water source) or percolates into the ground.[2] In my opinion, surface water diverted for irri-

2. I recognize that pursuant to legislation enacted in 1986, certain surface water may be stored through underground percolation without losing its surface water identity. *See* A.R.S. §§ 45–801 *et seq.; see also,* § 45–141(D).

gation purposes does not lose its character as surface water once it is diverted from a stream. Rather, it continues to be surface water, fully subject to prior appropriation and beneficial use limitations governing surface water rights. Similarly, upon the withdrawal of groundwater and the flow thereof into a pipeline or canal for transportation to its place of initial use, the water remains groundwater for the purposes of Arizona's groundwater code, subject to such limitations as that code places upon the withdrawal and disposition of groundwater. To hold otherwise would render Arizona's surface water and groundwater codes meaningless.

Notwithstanding these fundamental principles, the Cities and Utilities contend that the surface water and groundwater introduced into the Cities' water systems is totally consumed by the uses to which it is put, and that sewage effluent ceases to be surface or groundwater, but rather "originates" anew and is "produced" by the Cities at their treatment plants. From this premise they conclude that the sewage effluent falls within water law concepts applying to "developed" water, which is generally not subject to the doctrine of prior appropriation. *See Fourzan v. Curtis*, 43 Ariz. 140, 29 P.2d 722 (1934); R. Clark, 1 Waters and Water Rights, § 3.2, p. 27.

As applied to water in a stream system, developed water is that which has been added to the supply of a natural stream and which never would have come into the particular stream system in the absence of the effort of the developer. *See R.J.A. Inc., v. Water Users Association of District No. 6*, 690 P.2d 823 (Colo.1984); *Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.*, 529 P.2d 1321, 187 Colo. 181 (1974) (distinguishing between salvaged waters and devel-

oped waters).[3] The principles relating to developed water are also applicable to water imported into the stream system from another stream system.[4] *See Thayer v. City of Rawlins*, 594 P.2d 951 (Wyo.1979); *City and County of Denver v. Fulton Irrigating Ditch Company*, 179 Colo. 47, 506 P.2d 144 (1972).

The contention that sewage effluent is developed water has been considered by the Colorado Supreme Court in *Pulaski Irrigation Ditch Company v. City of Trinidad*, 70 Colo. 565, 203 P. 681 (1922). In rejecting that contention, the Colorado court pointed out that the water content of sewage effluent exists as fully as before it was used, and that when purified, it remains the same element that was originally diverted. The court then noted that, since the return of this water to the stream system would not increase the flow above what it was before the water was diverted, the fluid content of the effluent could not be considered as developed water. The *Pulaski* court's definition of "developed water" is uniformly recognized in cases dealing with the prior appropriation doctrine. *See* R. Clark, 1 Waters and Water Rights, § 3.2, p. 27.

Although I disagree with the conclusions reached by the *Pulaski* court concerning limitations on the use and disposition of sewage effluent, I agree with its conclusion that sewage effluent cannot be characterized as developed water.

Thus, in this case, to the extent that stream water constitutes a component of the Cities' sewage effluent, that component cannot be considered as newly created or developed water, since its return to the river would not add to the water of the stream system over and beyond what it would have been if that stream water had

---

**3.** The Colorado cases hold that the person creating salvaged waters gains no rights *against* prior appropriators from the stream system. Salvaged water is water in the river, or its tributaries (including the acquifer) which ordinarily would go to waste, but somehow is made available for beneficial use.

**4.** *Under the facts in this case,* Central Arizona Project water would generally be considered imported water. But see, A.R.S. § 45–101(6),

which provides in part: "For the purposes of administering this title, surface water is deemed to include central Arizona project water." In this dissent I do not determine the validity of the Utilities' contention that flood waters that would not otherwise be beneficially used, and which have been captured and stored behind the project's dam's system, must be treated as "developed" waters.

not been diverted. As to the groundwater component of the sewage effluent, although I do not consider it to be water "developed" in the sense that it has been newly created at the Cities' effluent treatment facilities, it does constitute developed water when it is discharged into the stream system in the sense that, because it was never diverted from the stream system in the first instance, its discharge into the system would increase the waters of the system over and beyond what they otherwise would have been. The concept that the groundwater component of sewage effluent discharged into the Salt River constitutes developed stream water, and the effect of applying that concept to define the rights of the parties to this litigation, will be addressed in more detail later in this dissent.

Summarizing, I would reject the contention that the fluid content of sewage effluent is something newly created rather than being a combination of groundwater and surface water. In my opinion, if the contracts for the sale of the Cities' sewage effluent are to be upheld, it must be on the basis that under the laws of this state governing appropriative rights, beneficial use, and groundwater management, the sale of the surface and groundwater components of the sewage effluent is not precluded.

## SALE OF THE GROUNDWATER COMPONENT OF THE SEWAGE EFFLUENT

The Longs argue that the sale of the groundwater component of the sewage effluent is invalid because the performance of the effluent contracts would violate statutory restrictions on the transportation of groundwater. See A.R.S. §§ 45–541 to –545. They contend that effluent must be put to reasonable and beneficial reuse for the benefit of the land from which it was withdrawn and, if reuse is not possible, the effluent must be returned to the common supply by discharging it into a stream or by allowing it to percolate into the ground. The Department of Water Resources has

filed an *amicus curiae* brief supporting this position.

A Tumbling T Ranches and the Gladdens (A Tumbling T parties) find nothing per se illegal about the reuse or sale of the groundwater-derived portion of the Cities' effluent and claim no ownership interest therein. They urge, however, that insofar as the Cities are unable to identify and segregate out the groundwater component of the effluent, they must continue to discharge the commingled waters into the Salt River.

Also appearing as *amicus curiae* is the city of Tucson, which argues that even though the groundwater component of effluent remains groundwater after passing through a municipal wastewater collection and treatment system, the groundwater code does not purport to limit the subsequent reuse or other disposition of groundwater. To support this argument, Tucson contends that, unlike appropriable surface water, groundwater is private property, which, once lawfully reduced to possession —i.e., having been withdrawn for use in compliance with the groundwater code— may be reused or otherwise disposed of without further regard to the groundwater code.

The trial court, adopting the position advanced by the Cities and the Utilities, held that effluent (including both the groundwater and surface water components) is not subject to regulation under Arizona surface water or groundwater laws. The court's conclusion was based upon the following observations: (1) the groundwater code's definition of effluent and provisions for the use of effluent or surface water as a substitute for groundwater imply that the legislature assumed or intended that effluent was something other than groundwater or surface water; (2) the legislature has enacted statutes that regulate sewage effluent from a health standpoint and has expressly authorized non-municipal entities to dispose of sewage effluent, including by sale, all without indicating that effluent is also to be subject to regulation under the groundwater and surface water codes; and (3) legislative recognition of effluent as a

valuable water resource, coupled with the comprehensiveness of the groundwater code, suggests that if the legislature had intended to subject effluent to regulation, it would have said so.

Although I find some merit in the trial court's observations concerning groundwater, I do not believe that the legislature intended that the groundwater component of effluent be completely free from regulation under the groundwater code. For example, I see no reason to suppose that A.R.S. § 45–452(A), which prohibits the use of "any water" for the irrigation of new acreage in active management areas, does not prohibit such use of the groundwater component of effluent to the same degree as any other type of water. Nevertheless, I agree with the result reached by the trial court as to the groundwater component of sewage effluent and I would hold that the Groundwater Management Act's transportation restrictions apply only to the initial use for which groundwater is withdrawn. Once groundwater has been lawfully withdrawn and used, any resulting groundwater effluent may be disposed of without regard to those restrictions.

Like the trial court, I begin my analysis with the groundwater code's definition of effluent as "water which, after being withdrawn as groundwater or diverted as surface water, has been used for domestic, municipal or industrial purposes and which is available for reuse for any purpose, whether or not the water has been treated to improve its quality." A.R.S. § 45–402(6). The trial court considered this definition to be evidence that the legislature intended or assumed that effluent is something other than either groundwater or surface water.

In this dissent, I have previously noted that in my opinion the nature of water as groundwater or surface water is established when it is diverted or withdrawn from the common supply, and that use alone cannot change the nature of the water. Although I agree with the trial judge's ultimate conclusion that the groundwater code does not preclude the sale of groundwater effluent, I see nothing

in the groundwater code's definition of effluent which indicates a legislative intent that effluent is no longer to be considered as groundwater, surface water or a combination of both. First, I note that the definition is limited to the use of the word "effluent" in the groundwater code. When considered in that context, it is apparent that the definition was included because subsequent sections of the groundwater code encourage the use of effluent, whether composed of groundwater, surface water, or a combination of both, over new groundwater withdrawals. The definition was necessary to identify with precision the lower-quality types of groundwater and surface water which must be utilized before consideration is given to new groundwater withdrawals.

The use of such lower-quality surface and groundwater is preferred if it "is available." I assume that the word "available" was used in both a physical and a legal sense. I find it difficult to imply from this definition a legislative intent to diminish the impact of surface water code provisions that would otherwise govern the legal "availability" of surface water. In this regard, I note that A.R.S. § 45–451(B) expressly provides: "This chapter [groundwater code] shall not be construed to affect decreed and appropriative water rights [surface water rights]."

However, notwithstanding my failure to agree with the trial judge's finding of a legislative intent to treat effluent without regard to the nature of its component water parts, I find no legislative intent in the groundwater code to subject the reuse or other disposition of groundwater effluent to the same restrictions that govern the groundwater's initial withdrawal and first use. Ample support for this conclusion can be found in those sections of the groundwater code that refer specifically to effluent.

For example, A.R.S. §§ 45–514 and –515 condition the issuance of groundwater withdrawal permits for mineral extraction and general industrial use, respectively, upon the lack of available surface water or effluent of adequate quality. The groundwater code thus encourages the use of

effluent (as well as available waters from other sources) in place of new groundwater withdrawals. In addition, A.R.S. §§ 45–494(2)(c) and –495(2)(b) provide that certain irrigation districts, which may withdraw, deliver, and distribute only limited amounts of newly withdrawn groundwater for irrigation within their service areas, may also contract to purchase, deliver, and distribute unspecified quantities of surface water and effluent for the same purpose. These provisions relating to the preferred use of effluent by irrigation districts and the mining industry demonstrate an intent to allow municipalities to sell and transport available effluent for use in locations which ordinarily would not be within their service areas.

I agree with the Long parties that the foregoing statutes express legislative recognition of effluent as an important water resource. However, I cannot accept the assertion that, by encouraging the use of effluent as a "substitute" for new groundwater withdrawals, these sections evidence a legislative intent to "equate" used groundwater with groundwater *in situ* and to subject both to identical restrictions. To the contrary, the groundwater code repeatedly reveals a preference for the reuse of groundwater, permitting reuse under circumstances where new groundwater withdrawals would be prohibited.

Furthermore, I note that even where the legislature has seen fit to subject the all-inclusive category of "water" to the groundwater code's transportation restrictions, it has specifically excluded effluent from those restrictions. See A.R.S. § 45–494.01(B) (limiting the amount of water that may be transported annually to acreage added to the service area of an irrigation district). In sum, I have found nothing in the groundwater code even to suggest that its transportation restrictions were meant to apply to any portion of the Cities' sewage effluent.

My final concern in this area is whether the Cities, by reason of their historical practices, are in any way obligated to continue to discharge their used groundwater into the Salt River for the benefit of downstream appropriators. The A Tumbling T parties concede that they have no vested ownership right in the groundwater portion of the Cities' sewage effluent, acknowledging the principle that unlike surface water, which is publicly owned even after diversion by an appropriator, groundwater becomes the property of whoever legally extracts it from beneath the ground. *See Collier v. Arizona Department of Water Resources,* 150 Ariz. 195, 722 P.2d 363 (App.1986); *Town of Chino Valley v. City of Prescott,* 131 Ariz. 78, 638 P.2d 1324 (1981).

The above-cited cases do imply that groundwater becomes private property once it is legally withdrawn. However, I do not rely on a private ownership concept to determine the rights of the parties in this case. While the groundwater portion of the Cities' effluent becomes stream water after it is discharged into the Salt River, it constitutes "developed" or "imported" stream water. Downstream users may not require the developers (the Cities) of developed water to continue to discharge it into the stream system. *See City and County of Denver v. Fulton Irrigating Ditch Company,* 179 Colo. 47, 506 P.2d 144 (1972); *Thayer v. City of Rawlins,* 594 P.2d 951 (Wyo.1979). Therefore, no appropriative rights against the Cities can result from the Cities' historical discharge of groundwater effluent into the Salt River.

Consequently, the A Tumbling T parties' only possible claim to the Cities' used groundwater is based upon the suggestion that tracing the Cities' effluent back to its several sources would be virtually impossible. In fact, the Utilities did complain in their cross-motion for summary judgment that such a task would require a herculean effort.

In order to preserve a claim to developed water, a person who has allowed that water to be commingled with appropriable public water must be able to identify that portion of the water that he claims is not subject to appropriation. *See, e.g., Herriman Irr. Co. v. Butterfield Min. Co.,* 19 Utah 453, 57 P. 537, 540 (1899); *City and County of Denver v. Fulton Irrigating*

*Ditch Company,* 179 Colo. 47, 506 P.2d 144 (1972). The A Tumbling T parties argue, therefore, that to the extent that the Cities' effluent cannot be traced to its various sources, rights in the commingled waters must be defined according to stream water principles. I agree.

The groundwater portion of the Cities' effluent, however, should be traceable to its source. Case law supports the proposition that effluent can be broken down according to its constituent water components. However, it is not necessary to identify the particular particles of water by origin. As the Colorado Supreme Court stated in *Fulton:*

"With the question of quality not involved, we accept Denver's argument that water is fungible or is to be treated the same as a fungible article. The particles of water do not have to be identified as coming from Western Colorado, but rather water, whether or not contained in effluent, can be divided volumetrically. A percentage of the effluent discharged by the Metro plant can be considered as imported water." 506 P.2d at 150.

The Cities are statutorily obligated to account for the amounts of surface water and groundwater delivered to their municipal customers. *See* A.R.S. § 45–468. The proportion of the water that was withdrawn as groundwater would provide an adequate measure of the groundwater component of the effluent.

I conclude that the sale of the groundwater component of the Cities' sewage effluent is valid under Arizona law and is not subject to regulation under Arizona's Groundwater Management Act. I next consider the validity of the contractual provisions for the sale of the surface water component of the sewage effluent.

## THE SALE OF THE SURFACE WATER COMPONENT OF THE SEWAGE EFFLUENT

As previously stated, the trial judge in his minute entry decision concluded that the surface water component of sewage effluent was not subject to regulation under Arizona's surface water laws. Admittedly, no statutory provisions or prior Arizona decisions expressly state that sewage effluent is, or is not, subject to Arizona's surface water code. I have previously discussed and rejected the trial judge's holding that the groundwater code's definition of effluent for the purposes of the groundwater code implied a legislative intent to exempt surface water effluent entirely from limitations imposed on the ownership and use of surface water by Arizona's surface water code. The trial judge also based his decision upon an examination of several statutes that indicate that effluent may be purchased and sold. He observed that these statutes do not expressly indicate that such purchase or sale would be subject to the administrative procedures and statutory limitations generally applicable to changes in use or the place of use of water rights acquired under existing Arizona law.

The Longs and the A Tumbling T parties both strongly disagree with the trial judge's analysis of these statutory provisions. In particular, they contend that the trial judge erred when he referred to statutes regulating effluent from a health standpoint and then stated that nothing in these statutes indicates an intent to also regulate effluent under the groundwater or surface water codes. I agree with their contentions and find several provisions in the health code indicating that the Department of Health's regulatory powers pertaining to effluent were not intended to supplant this state's law regulating surface and groundwater rights. Thus, A.R.S. § 36–1869 directs the department of health services to "confer and cooperate with the director of water resources in the formulation of plans relative to the quality and safety of the waters of this state." A much more direct expression of the legislature's intent is found in A.R.S. § 36–1857(B), which indicates that laws passed for the purpose of controlling pollution cannot be used for the purpose of defeating appropriative rights:

"B. In administering this article ... the council shall:

"1. Not require any present or future appropriator or user of water to divert, cease diverting, exchange, cease exchanging, store, cease storing, or release any water for the purpose of controlling pollution in the waters of this state." Similarly, *see* A.R.S. § 36–1859(C):

"C. In issuing any permit or formulating any rule or regulation the director shall be guided by the principle what waters of the state are put to beneficial use within the state and become return flows to the waters of the state and are subsequently reused and that such permits, rules and regulations shall not diminish the water available for such beneficial uses nor deprive the state of such water."

For these reasons, I disagree with the trial judge's conclusion that these statutory provisions indicate a legislative intent to exempt the appropriable water component of sewage effluent from principles that would otherwise govern the appropriation and use of surface water. However, I acknowledge that several Arizona statutes demonstrate a legislative recognition of the concept that sewage effluent may be sold, and in this dissent I have previously noted my conclusion that Arizona's groundwater code does not impose limitations on the sale of the groundwater component of the effluent. I now consider the extent of the limitations that the surface water code's doctrines of beneficial use and prior appropriation impose on the sale of the surface water component of sewage effluent.

The A Tumbling T parties argue that the trial judge's decision allowing the Cities to sell appropriable water that is not consumed by the Cities' beneficial use departs from a basic premise of Arizona law governing appropriable surface waters. Citing A.R.S. § 45–141(A), they urge that appropriable surface waters belong to the public, and that the Cities by their appropriation do not gain ownership of the appropriated waters so as to give them a right to sell the unconsumed effluent. Rather, it is urged that the Cities only have the right to the use of the water, limited by the purpose for which the appropriation was made. *See*

A.R.S. § 45–141(A); *Adams v. Salt River Valley Water Users' Association*, 53 Ariz. 374, 89 P.2d 1060 (1939); *Slosser v. Salt River Val. Canal Company*, 7 Ariz. 376, 65 P. 332 (1901); *Salt River Valley Water Users' Association v. Kovacovich*, 3 Ariz. App. 28, 411 P.2d 201 (1966). In this connection, the A Tumbling T parties point to A.R.S. § 45–141(B), which limits the right of an appropriator: "Beneficial use shall be the basis, measure and limit to the use of water."

In my opinion the concept that appropriated waters are "owned" by the public rather than by the appropriator is valid only as a shorthand method of expressing the limitations that the doctrine of beneficial use generally imposes upon the rights of an appropriator. At times, the concept is of little practical significance. A more accurate statement would be that the appropriator's ownership of appropriated water does not include the full bundle of rights normally associated with ownership. Thus, as stated by this court in *City of Phoenix v. State of Arizona*, 53 Ariz. 28, 85 P.2d 56 (1938):

"It is a recognized principle that public water, or water subject to appropriation under our laws, does not belong to the appropriator in the sense that he may do with it what he pleases or what the owner of property may generally do. But it is also recognized that the *use* of such water is subject to ownership and sale. *Brewster v. Salt River Valley Water Users' Assn.*, 27 Ariz. 23, 229 Pac. 929. If the city cannot dispose of the water by furnishing it to its patrons or consumers, then it cannot make the appropriation for that is the major reason for the appropriation. Its appropriation is valid and it can certainly sell its use for all or any purposes to which it may lawfully be put." 53 Ariz. at 33, 85 P.2d 56.

Other illustrations indicating that appropriated surface water even though not "owned," can be sold are plentiful. Thus the manufacturer of ice for wholesale or retail sale purposes obviously sells the water content of the ice (or its use to the point of total consumption). Likewise, water is

the principal item (by quantity) sold by the beverage industry or a distiller of water. The principle to be derived from this court's above-quoted pronouncement in *City of Phoenix* and from the foregoing illustrations is that nothing inherent in the doctrine of prior appropriation or beneficial use precludes the disposition by sale of public water that has been validly appropriated. Rather, to the extent that such a limitation might be present in any specific case, its existence results from the doctrine of beneficial use, that is, the restrictions imposed upon the rights of the appropriator by reason of the purpose for which the appropriation was made.

When viewed from this perspective, the real issue in this appeal concerns the limits that the doctrine of beneficial use imposes upon the disposition of sewage effluent by the Cities. If the disposition of sewage effluent by sale cannot be considered to be within the concept of beneficial use of water appropriated by a municipality, the trial judge's decision as to the surface water component of the effluent must be reversed. On the other hand, if it is determined that beneficial use of appropriated water might include the disposition of sewage effluent by sale, then one further question must be addressed: whether the Cities might have lost or abandoned a portion of their appropriative right by historically discharging their surface water effluent into the Salt River, where it may have become subject to the claims of downstream appropriators.

Although the doctrine of beneficial use is adopted in A.R.S. § 45–141(B) as the "basis, measure and limit to the use of [appropriable surface] water," Arizona, unlike

some jurisdictions, has not attempted to provide a statutory standard for guidance in determining what specific practices might be permitted as part of the use which forms the basis of the appropriation.[5] I note that A.R.S. § 45–151(A) sets forth a statutory list of permitted uses, but this list does little to illuminate the details as to what might constitute permitted practices within the limits of the appropriation for the permitted use.[6]

Beneficial use is at best a vague legal concept, the boundaries of which are difficult to define. *See generally*, Hutchins, Water Rights in the Nineteen Western States 8–20, 522–46 (1971); Trelease, The Concept of Reasonable Beneficial Use in the Law of Surface Streams, 12 Wyo.Law Journal 1 (1957). As previously noted, the Alaska legislature has defined beneficial use. That definition incorporates some general concerns, usually expressed in the case law, as follows: beneficial use is "any use of water that is reasonable and beneficial to the appropriator, and at the same time is consistent with the interests of the public in the best utilization of water supply." What constitutes a beneficial use necessarily depends on the circumstances of each case. *City and County of Denver v. Sheriff*, 105 Colo. 193, 96 P.2d 836 (1939). Of course, to the extent that express statutory guidance exists, the courts must abide by the terms of the statute. In the absence of statutory guidance, the details of what specific practices are permitted within the broad parameters of statutorily authorized uses must be determined by the courts. Since the doctrines of beneficial use and prior appropriation are concepts

---

5. *See, e.g.,* Alaska statutes, § 46.15.260 (1971); South Dakota Compiled Laws Annot. § 46–1–6(6) (1967); Texas Water Code Annot. Title 2, § 5.002 (Vernon 1972).

6. A.R.S. § 45–151(A) provides:
    "A.   Any person or the state of Arizona or a political subdivision thereof may appropriate unappropriated water for domestic, municipal, irrigation, stock watering, water power, recreation, wildlife, including fish, artificial groundwater recharge pursuant to chapter 2, article 13 of this title or mining uses, for his personal use or for delivery to consumers. The person or the state of Arizona or a politi-

cal subdivision thereof first appropriating the water shall have the better right." (Footnote omitted).
    The permitted uses listed in § 45–151(A) apparently are not exclusive. *See* A.R.S. § 45–181(1):
    "1.   'Beneficial use' includes *but is not limited to,* use for domestic, municipal, recreation, wildlife, including fish, agricultural, mining, stockwatering and power purposes." (Emphasis added.)
    Note the absence of any specific reference to manufacturing or industrial uses.

which in their inception reflected the social and economic values placed on various uses of water in a largely undeveloped and arid west, any decision made by this court should also necessarily reflect these same values.

The courts in other prior appropriation jurisdictions have reached inconsistent results when faced with questions involving the beneficial use by a municipality of its appropriated water insofar as concerns the use and disposition of sewage effluent. Thus, in *Wyoming Hereford Ranch v. Hammond Packing Co.*, 236 P. 764 (Wyo. 1925), the court considered whether the city of Cheyenne's "full beneficial use" of appropriated water included the right to sell the city's sewage effluent to the defendant in that case. The city had previously released part of the effluent directly into a ditch on the defendant's land and part into a creek from which the plaintiff's appropriated water was diverted. In discussing the validity of the city's contractual disposition of its sewage effluent, the court stated:

"It is well known that the disposition of sewage is one of the important problems that embarrass municipalities. In order to dispose of it without injury to others, a city may often be confronted with the necessity of choosing between several different plans, and in the selection of the plan to be followed we think it should be permitted to exercise a wide discretion. In determining how it will make a proper disposition of that which may be termed a potential nuisance, we think the city should not be hampered by a rule that would always require the sewage to be treated as waste or surplus waters. Sewage is something which the city has on its hands, and which must be disposed of in such a way that it will not cause damage to others. It would often be considered the height of efficiency if it could be disposed of in some other manner than by discharging it into a stream. Even in this state, where the conservation of water for irrigation is so impor-

tant, we would not care to hold that in disposing of sewage the city could not adopt some means that would completely consume it. It might, we think, be diverted to waste places, or to any chosen place where it would not become a nuisance, without any consideration of the demands of water users who might be benefited by its disposition in some other manner. In providing such a place, the city might acquire the right to discharge the sewage on the lands of any person willing to suffer such a use of his lands, and we see no reason why this right might not be gained by the city in consideration of the landowner's right to use or dispose of the sewage in any lawful way." 236 P. at 772.

Accordingly, the Wyoming court upheld the sale by Cheyenne of the sewage effluent that was discharged directly into the buyer's ditch. However, as to that portion of the effluent that was discharged into the creek, the court held that these waters had again become public waters subject to appropriation, stating:

"The full, beneficial use of the waters that have become a part of the sewage may, because of the necessity of disposing of the sewage, require that such water, a part of the sewage, be consumed, or so diverted that it does not again become a part of the waters of the stream. But the sewage deposited in Crow creek is not consumed, and is not so diverted. It becomes mingled with the waters of the stream, and, as is conceded, the water content of the sewer increases the volume of water in the stream suitable for irrigation. The city's right to the beneficial use of the water has been fully enjoyed, and the water has been returned to the stream where it is susceptible of further beneficial use by other appropriators. This further use must be had under state control by those who have acquired rights under the state laws." [7] 236 P. at 773.

7. In a later decision, *Thayer v. City of Rawlins*, 594 P.2d 951 (Wyo.1979), the Wyoming Supreme Court again considered the rights of downstream parties who had based their appro-

priations on the upstream discharge of a city's sewage effluent. Because the sewage effluent resulted from water imported by the city from another stream system, the court held that the

The Colorado Supreme Court reached a contrary result in *Pulaski Irrigation Ditch Co. v. City of Trinidad,* 70 Colo. 565, 203 P. 681 (1922). In early times the city of Trinidad had discharged its sewage effluent directly into the Las Animas river. Eventually, the district court enjoined this practice, and the city then discharged the sewage into settling pits constructed on land adjoining the river. From these settling pits, a considerable part of the water content of the sewage then seeped or ran back into the river and became a part of the supply for appropriations below the point of discharge. Several years later, the city decided to build two water purification plants and, upon their completion, proposed to sell the effluent to its co-defendant, Model Land and Irrigation Company. The downstream appropriators sought to enjoin this proposed sale. In reversing the trial court's judgment in favor of the city, the Colorado Supreme Court rejected the city's contention that the sewage effluent was developed water, and held that the city could not sell the treated effluent, but rather must return it to the stream.

In its discussion, the *Pulaski* court emphasized that it was dealing with a fact situation in which the city was voluntarily purifying its effluent, thereby producing effluent which could be returned to the river. The court indicated that a different method of effluent treatment might well result in a total consumption of the effluent (e.g., evaporation), and suggested that the court's "return to the river" doctrine might not then be applicable. However, nothing in the opinion indicates a retreat from the court's position that in no event could the purified effluent be sold.

A decision of the Supreme Court of New Mexico further demonstrates the difficulties that the courts have had in resolving questions concerning water rights and the disposition of municipal sewage effluent. In *Reynolds v. City of Roswell,* 99 N.M. 84, 654 P.2d 537 (1982), the city had applied for a permit to change the place of use of groundwater, which is subject to appropriation under New Mexico law. Historically, downstream users had acquired no rights as

the city had sold part of its effluent to a golf club, had sold another part to some farmers, and had discharged the remainder into the Hondo river. Upon the granting of the permit for a change of the place of use, the state engineer attached conditions which basically required the city to continue to dispose of its sewage effluent as it had in the past. Although the opinion is to some extent unclear, it appears that the city, at some future time, intended to reuse its effluent within its own municipal water system. It therefore objected to the conditions imposed by the state engineer.

The *Reynolds* decision is in the first instance unusual in that it presents a situation in which the city had historically sold a portion of its effluent, and that historical practice was not questioned. The issue presented concerned the city's future intention to discontinue disposing of its effluent by discharge or otherwise than by its own consumptive use and reuse. The New Mexico court first found that the sewage effluent came within a statutory definition of "artificial surface waters", and thus were "primarily private and subject to beneficial use by the owner or developer thereof." As a consequence, the conditions imposed by the state engineer were held to be improper. However, not being entirely satisfied with the statutory basis of its opinion, the court further noted that, based upon cases from other jurisdictions, its conclusion was supported by strong policy considerations. The "strong policy considerations" which the New Mexico court embraced were those stated by the Wyoming Supreme Court in *Wyoming Hereford Ranch v. Hammond Packing Company,* previously discussed in this dissent. In this connection, I note that water law commentators have recognized a tendency of the courts to sometimes be more lenient in applying beneficial use concepts to municipalities than they might otherwise be in considering the rights of private individuals. *See,* 12 Land and Water Law Review, 431, 438 (1977).

In my opinion, the Wyoming court's decision is sound and in accord with the policy against the city.

considerations reflected in Arizona's legislative enactments. I would uphold the validity of the contracts for the sale of the surface water component of the effluent, not on the basis that the water content of the effluent is not subject to the surface water code, but rather on the basis that the right to the full beneficial use of appropriated water by a municipality includes the right to dispose of sewage effluent in any lawful manner, including by sale. Such a holding would allow municipalities to maximize their use of appropriated water and to dispose of sewage effluent in an economically feasible manner. Likewise, such a holding would be consistent with our legislature's expressed preference for the use of effluent as opposed to new groundwater withdrawals, and would encourage the best utilization of Arizona's dwindling groundwater supply. Finally, a degree of flexibility would be provided that is essential to a city's ability to meet federal and state environmental and health standards.

Although I base my conclusions on an entirely different legal basis, I therefore agree with the majority to the extent that the majority holds that the Cities may lawfully contract for the sale of sewage effluent without complying with statutory provisions regulating the change of use or place of use of surface or groundwater rights.[8] My holding, however, would not be as broad as that embodied in either the majority's or the trial court's decision.

First, I have noted that in my opinion the water component of sewage effluent retains its identity as surface water, groundwater or a mixture of both, in accordance with the initial characterization of its components. Second, although I would hold

that the right to dispose of sewage effluent by sale is included within the concept of full beneficial use, I would also hold that this right or a portion thereof may be lost if the city fails to make full use of the appropriated water for five successive years as provided by A.R.S. §§ 45–141(C) and 45–188.[9] In my opinion these statutory provisions have potential application to the rights involved in this litigation. The burden is on the downstream appropriators to show that this loss has occurred, and any conclusion in that regard would have to await further development of the facts in the trial court.

The majority disagrees, and holds that the Cities' historical practice of discharging effluent into the Salt River Channel where it became available to downstream appropriators could not constitute an abandonment under A.R.S. §§ 45–141(A) and 45–188 of any portion of the Cities' prior appropriative rights because

> "These statutes apply when an appropriator fails to use the water. That is not the case here. The Cities did use the water which was appropriated."

This conclusion by the majority fails to recognize the distinction between uses of water which are almost totally consumptive of the water used, and those uses which result in a lesser consumption. By way of background, in my analysis of this issue I have assumed that the irrigation rights from which the Cities' rights have evolved were almost totally consumptive in nature. Thus, when the change was made from an irrigation use to a municipal use, the Cities would have been entitled to continue a use

---

8. Since no new application for appropriation or change in use is required, A.R.S. § 45–156 relating to legislative authorization for an appropriation to generate power in excess of twenty-five thousand horsepower is not applicable.

9. A.R.S. § 45–141(C) reads as follows:
   "C. When the owner of a right to the use of water ceases or fails to use the water appropriated for five successive years, the right to the use shall cease, and the water shall revert to the public and shall again be subject to appropriation."
   A.R.S. § 45–188 reads as follows:

"Any person entitled to divert or withdraw public waters of the state through an appropriation authorized under § 45–151, court decree, previous possession or continued beneficial use who abandons the use thereof, or who voluntarily fails, without sufficient cause, to beneficially use all or any part of the right to withdraw for any period of five successive years shall relinquish such right or portion thereof. The rights relinquished shall revert to the state, and the waters affected by such rights shall become available for appropriation to the extent they are not lawfully claimed or used by existing appropriators."

which would likewise have been almost totally consumptive in nature. However, the Cities did not do so. Rather their initial consumptive use was considerably less than total. They returned to the river a substantial part of the waters initially diverted. Under well established western water law principles, this lack of total consumptive use could subject the Cities to a loss of the right to later resume a total consumptive use. This loss would occur if the lack of total consumptive use was continued for the statutory abandonment period. As stated by a noted water authority:

> "Where, after use by a prior appropriator, water is discharged into a stream for the purpose of drainage or as a convenient method of disposing of it, ... it works an abandonment of such water, and the water thus discharged becomes a part of the natural stream, and is subject to reappropriation and to the same rights as the water naturally flowing therein, and can not afterward be taken out by the original appropriator to the injury of other rights which have attached and vested to it. The authorities hold that in all cases where water formerly appropriated, or which has been under the control of any person, is permitted to flow down the natural channel of a stream below the point of diversion of the appropriator, ... it works an immediate and express abandonment of all the water permitted so to escape; and subsequent appropriators can not be deprived of their rights in and to this water appropriated by them by an attempt upon the part of the first appropriator to shut off their supply by enlarging the amount diverted by him, or by any changes in the place or manner of use, which would injure the rights of such subsequent appropriators to the continuous flow of the stream as it was at the time that they made their appropriations."

Kinney, *Irrigation and Water Rights,* Vol. 2, Second Edition, § 1114.

By statute, abandonment does not occur in Arizona unless the failure to use contin-

ues for five years. As applied to this case, if abandonment has occurred, the Cities would continue to have the right to withdraw and make normal use of their full appropriation, but would not be entitled to increase their *consumptive* use by discontinuing the discharge of the abandoned portion of their appropriative rights into the Salt River Channel.

For the foregoing reasons, I do not accept the majority's conclusion that Arizona's abandonment statutes have no potential application to the Cities' plans to change their method of disposition of effluent and to discontinue the discharge of the effluent into the channel of the Salt River.[10]

Likewise, my conclusions on the abandonment issue would necessarily require a rejection of the argument that through the application of irrigation waste water principles the Cities could at any time discontinue the discharge of effluent into the river, thereby defeating the rights that downstream appropriators might have previously acquired in water abandoned by the Cities pursuant to A.R.S. §§ 45–141(C) and 45–188. *See City of Boulder v. Boulder and Left Hand Ditch Company,* 192 Colo. 219, 557 P.2d 1182 (1976); *Metropolitan Denver Sewage Disposal District No. 1 v. Farmers Reservoir and Irrigation Company,* 179 Colo. 36, 499 P.2d 1190 (1972).

In *Lambeye v. Garcia,* 18 Ariz. 178, 157 P. 977 (1916) and *Wedgworth v. Wedgworth,* 20 Ariz. 518, 181 P. 952 (1919), this court considered issues relating to rights that might be obtained by subsequent users of irrigation waste waters (sometimes also referred to as "surplus" water in both decisions). Neither *Lambeye* nor *Wedgworth* involved an appropriator's right to use waste waters diverted from a natural channel. Instead, the waste water had been captured and used by a subsequent user before the waste water had returned to a natural channel. On these facts we held that the waste water was not

---

**10.** For a general discussion of the limitations which the prior appropriation doctrine places on changes which increase the amount of water consumptively used by an appropriator, *see* Kinney, *Irrigation and Water Rights,* Vol. 2, Second Edition, § 870.

subject to appropriation and that the subsequent user could obtain no vested rights in it. We noted that one who captures such waste water may not insist that the initial appropriator continue to use his irrigation water and, accordingly, that the supply of waste water could be discontinued or withdrawn at any time.

Shortly after our holdings in *Lambeye* and *Wedgworth,* the Arizona statute governing appropriable waters was amended so as to reflect that even though "waste or surplus waters" were not subject to appropriation prior to reaching a stream or natural channel, such waters would become subject to appropriation once they reached a stream or other natural channel. *See* Laws 1921, Ch. 64, § 1 (A.R.S. § 45–141(A)). In my opinion, this amendment effectively limited our holdings in *Lambeye* and *Wedgworth* to situations involving an attempted appropriation of waste waters before their return to a natural channel.

I find nothing in *Wedgworth* and *Lambeye,* or other Arizona law to support the conclusion that where the holder of an established water right has abandoned part of his right to make a totally consumptive use of his appropriated water, he may thereafter increase his consumptive use to the detriment of downstream users who may have acquired appropriative rights in the unconsumed water.

The majority recognizes that the 1921 amendment to A.R.S. § 45–141(A) makes waste or surplus waters appropriable by downstream users when these waters are flowing in a natural channel. However, in the majority's view, the downstream appropriator would gain rights only against other downstream users, and not against the Cities. In other words, under the majority's view the downstream users could not require the Cities to continue the discharge of its unconsumed water into the river. I agree that initially no rights against the Cities could be obtained by the downstream users of the discharged waters. However, it appears clear to me that if the discharge by the Cities were to continue for the statutory period so as to constitute an abandonment by the Cities of their right to increase the *consumptive* use of their appropriated water, then the appropriative rights obtained pursuant to A.R.S. § 45–141(A) by a downstream appropriator would be enforceable against the Cities as well as other subsequent downstream users.

## CONCLUSION

For the reasons stated in this dissent, I would reverse the judgment entered by the trial court and remand for further consideration of the surface water abandonment issues. In view of my conclusion that the contracts for the sale of the sewage effluent do not per se violate Arizona groundwater or surface water law, injunctive relief would not be appropriate except to the extent that the A Tumbling T parties could show that they have obtained appropriative rights based on the historical discharge of the effluent into the river, and that the performance of the contracts would lessen that historical discharge so as to leave them with insufficient water to satisfy those rights.